712 A.2d 132

**John DOE**

v.

**Jane DOE.**

No. 1330, Sept. Term, 1997.

Court of Special Appeals of Maryland.

June 29, 1998.

300

M. Albert Figinski (David W. Erb and Weinberg & Green, L.L.C., on the brief), Baltimore, for appellant.

Paul Mark Sandler (Stacie F. Dubnow, Freishtat & Sandler, Baltimore, Thomas C. Ries and Kaufman, Ries & Elgin, P.A., Towson, on the brief), for appellee.

Argued before HARRELL, THIEME and KENNEY, JJ.

HARRELL, Judge.

On 12 July 1996, appellant, John Doe,[1] filed a Complaint for Absolute Divorce against appellee, Jane Doe, in the Circuit Court for Baltimore County. The ground asserted for the divorce sought by Mr. Doe was Ms. Doe's alleged commission of adultery. On 5 December 1996, Mr. Doe filed an amended complaint, adding Counts II through VIII, which are

---

1. For reasons that will become obvious, the proper names of the parties have been redacted.

the subject of this appeal. Counts II and III alleged fraud and intentional infliction of emotional distress, respectively, relating to Ms. Doe's alleged knowing, deliberate, false, and affirmative misrepresentation to Mr. Doe that he was the father of two of the parties' three children. Counts IV through VIII alleged fraud, negligent misrepresentation, promissory estoppel, breach of contract, and constructive trust, respectively, relating to allegations that Ms. Doe repeatedly dissuaded Mr. Doe from contributing to his 401(k) plan by falsely and intentionally promising Mr. Doe that he could rely on Ms. Doe's stockholdings for his retirement. Compensatory and punitive damages were sought on all counts, save that for a constructive trust. On 31 January 1997, Ms. Doe filed a motion to dismiss Counts II through VII. The trial court held a hearing on the motion on 16 May 1997 and on 8 July 1997 issued an order granting Ms. Doe's motion to dismiss. On 14 July 1997, the court granted a motion for entry of final judgment as to Counts II through VIII pursuant to Rule 2–602(b) [2].

Mr. Doe presents the following questions for our review, which we have rephrased:

I. Whether the trial court erred in dismissing Counts II and III on public policy grounds.

---

**2.** Rule 2–602(b)(1) allows the trial court, if it expressly determines in a written order that there is no just reason for delay, to direct in the order the entry of a final judgment as to one or more but fewer than all of the claims before it. This provision is an exception to the general rule that an order that adjudicates fewer than all of the claims in an action is not a final judgment and therefore is not ripe for appeal. *Tharp v. Disabled American Veterans*, 121 Md.App. 548, 551–52, 710 A.2d 378 (1998). This limited exception is only available on rare occasions to avoid harsh results. *Id.* The case *sub judice* is just such a case. Here, the trial court properly directed the entry of final judgment as to Mr. Doe's tort claims, leaving the divorce case pending. As Mr. Doe argued in his written motion for entry of final judgment, filed on 11 July 1997, delay of entry of final judgment on his tort claims might result in a second trial of his divorce action and denial of his Constitutional right to a jury trial on the many factual issues which overlap the legal and equitable aspects of this case. The record of this case serves as a model for the proper invocation and disposition of a Rule 2–602(b)(1) certification.

II. Whether the trial court erred in finding the allegations in Counts II and III insufficient to state a cause of action.

III. Whether the trial court erred in dismissing Counts IV through VIII for failure to state a cause of action.

## FACTS

Mr. and Ms. Doe married on 2 September 1989. During the course of their marriage, three children were born: J.D. Doe, born 21 February 1992; and twins A.E. Doe and Z.S. Doe, born 10 July 1993. Mr. Doe was named as the father on the birth certificates of each of the three children, and Ms. Doe held out Mr. Doe as the biological father of each of the children.

Unbeknown to Mr. Doe, Ms. Doe, an art student, began a sexual affair in 1990 with M.G., Ms. Doe's art professor. In 1991, Ms. Doe began working at M.G.'s art gallery in Baltimore. At Ms. Doe's request, M.G. became godfather to all three children. On 2 July 1996, Mr. Doe discovered a letter written by Ms. Doe to M.G. which stated, in part:

It remains my belief that at some point in the course [of] our relationship I disappointed you deeply, and that this is a[t] least partially (if not wholly) responsible for bringing about the distance which has complicated our interactions during the past few years. The commencement of this change seems to roughly correlate with the birth of our children ... I realize that my decision not to terminate these pregnancies ... If my decision to bear J.D. & A.E. & Z.S. altered the feelings you held towards me, I am sorry. Though I have occasionally wondered if I made the correct choice in this I am convinced that given my perception (or misconceptions) about the bond [between] us at that time, I could not have decided otherwise. You will always be the father of my children. i.e.—have/develop your own relationship with each of them as you wish. The divulging of their identities will be at your discretion. If for some unforeseeable reason it should become necessary for me to provide information to the children regarding how they came to be

Z.S., A.E., and J.D. will likely receive the [point] of view reflected in this letter, your name ... will be withheld and your privacy protected ... Included please find cards from the St. Paul's parish documenting your godparentship to the children.

Mr. Doe spoke with M.G. on 7 July 1996. During the course of that conversation, M.G. admitted the affair and acknowledged that he and Ms. Doe had engaged in sexual relations at the time J.D. was conceived in May 1991, and did not deny that he and Ms. Doe had engaged in sexual relations at or about the time A.E. and Z.S. were conceived in November 1992. Mr. Doe confronted his wife on 11 July with the letter and M.G.'s admissions. Ms. Doe denied having sexual relations with M.G. and refused to discuss the children's paternity. The next day Mr. Doe filed for divorce.

On 25 July 1996, Mr. Doe and the children submitted blood samples for DNA testing regarding Mr. Doe's paternity. The test results, provided in October 1996, confirmed that Mr. Doe was J.D.'s biological father but excluded him as the biological father of the twins.

Mr. Doe alleged that throughout the parties' marriage the sexual encounters between Ms. Doe and himself were infrequent. In part because of Ms. Doe's health problems, the parties used withdrawal as their sole source of birth control. Mr. Doe recalled that in November or early December 1992, Ms. Doe uncharacteristically instigated sexual intercourse and "knowingly, deliberately and physically, prevented [Mr. Doe] from withdrawing when necessary." Mr. Doe alleges that this conduct, together with Ms. Doe's letter to M.G., allows a reasonable inference that Ms. Doe knew that M.G. had impregnated her before the rare sexual encounter with Mr. Doe, and that she seduced Mr. Doe solely to mislead him into believing that he was the biological father of the twins born thereafter.

In addition to his allegations regarding Ms. Doe's concealment of the twins' paternity, Mr. Doe made several allegations regarding the parties' finances. Specifically, Mr. Doe alleged

that in 1990 he discussed with Ms. Doe his desire to take advantage of the opportunity to contribute to the 401(k) retirement plan established by his employer. Ms. Doe asked him instead to continue to contribute one hundred percent of his salary into the joint family bank account, and, in return, Ms. Doe promised that Mr. Doe could rely on her stockholdings for his retirement. Based on these representations, Mr. Doe continued to deposit his entire salary into the parties' joint account, which Ms. Doe managed.

Throughout the marriage, Mr. Doe continued to express his desire to begin contributing to the 401(k) plan, but Ms. Doe repeatedly dissuaded him from doing so, claiming that Mr. Doe's income was needed to pay for family expenses. She allegedly continued to assure him that he would be able to rely on her stockholdings for his retirement. As of November 1996, however, Ms. Doe has taken the position that Mr. Doe will not be able to rely on her stockholdings for his retirement.

## DISCUSSION

Maryland Rule 2–322(b)(2) allows a defendant to seek a dismissal on the ground that the complaint fails to state a claim upon which relief can be granted. A complaint fails to state a claim when, even if the allegations of the complaint are true, the plaintiff nevertheless is not entitled to relief as a matter of law. *Lubore v. RPM Associates, Inc.,* 109 Md.App. 312, 322, 674 A.2d 547, *cert. denied,* 343 Md. 565, 683 A.2d 177 (1996). When considering a motion to dismiss for failure to state a claim, the circuit court only examines the sufficiency of a pleading. *Id.* " 'The grant of a motion to dismiss is proper if the complaint does not disclose, on its face, a legally sufficient cause of action.' " *Id.* (citing *Hrehorovich v. Harbor Hosp. Ctr.,* 93 Md.App. 772, 784, 614 A.2d 1021 (1992)). On appeal, this Court "must assume the truth of all well-pleaded facts . . . as well as inferences which may reasonably be drawn from those well-pleaded facts." *Lee v. Denro, Inc.,* 91 Md.App. 822, 828, 605 A.2d 1017 (1992). If the complaint contains any material facts that support the plaintiff's right to recover, this Court must reverse the order of dismissal. *Id.*

In the case *sub judice* the circuit court found Mr. Doe's complaint legally insufficient for two reasons: First, the court found that Mr. Doe's allegations of fraud and intentional infliction of emotional distress were barred by public policy. Second, the court found that the complaint failed to include any material facts supporting Mr. Doe's right to recover not only on the fraud and intentional infliction of emotional distress counts, but also on the counts relating to Ms. Doe's stockholdings and Mr. Doe's intentions regarding his employer's 401(k) plan. We will first address the trial court's finding that Mr. Doe's claims are barred by public policy. Then we will turn to the specific allegations to determine if the pertinent counts of the complaint are sufficient to state a cause of action.

## I.

The issue presented in this case is one of first impression in this State: Whether public policy precludes spouses from suing each other for fraud and intentional infliction of emotional distress even though the Maryland Court of Appeals has abrogated interspousal immunity. The court below believed such public policy exists. The court opined:

> Maryland has not yet confronted the issue of whether one spouse can sue another for fraud and intentional infliction of emotional distress relating to the paternity of the children born during the course of a marriage. Under the current state of the law, one spouse may sue another for certain outrageous and intentional tortious conduct. The Court of Appeals has expressly stated that interspousal tort immunity no longer exists in Maryland. *Lusby v. Lusby,* 283 Md. 334 [390 A.2d 77] (1978).... [In *Lusby* t]he Court noted that "no sound public policy in the latter half of the 20th-century ... would prevent one spouse from recovering from another for the outrageous conduct ... alleged" by the Plaintiff in that situation. *Id.* at 357 [390 A.2d 77]. Implicit in this statement is that public policy considerations may preclude interspousal suits for intentional torts in certain

situations. The facts of the instant case present just such a situation.

A.E. Doe and Z.S. Doe are almost four years old. For their entire life they have known the Plaintiff [Mr. Doe] as their father and have benefitted from his love and support. He notes in his complaint that he "has developed a close and loving relationship with each of them, cared for them, raised them and invested substantial time, effort, money and other resources . . . in each child's health, welfare and well-being." Plaintiff is seeking relief for the emotional distress of learning that he was not the biological father of the twins and also for the financial investment incurred as a result of this alleged fraud. To allow him to litigate these claims, outside the context of the domestic action, is not in the best interest of the children and provides little additional benefit to Plaintiff.

In considering whether to allow these tort claims to proceed, the Court must balance the harm suffered by the Plaintiff against the potential harm to the children. The Plaintiff is not without a remedy. The conduct of the Defendant is relevant to the issue of custody and will impact on the Court's willingness to grant a monetary award. The Plaintiff can be compensated for the wrongs he has suffered without litigating these issues again in tort. Conversely, the potential harm to the children is great. Inter-familial warfare takes its toll on children, regardless of their age or awareness of the proceedings. These painful issues would be litigated twice, once in front of a judge for the divorce and again in front of a jury. Moreover, one day these children may become aware that the only father they had known sought to recover damages for his relationship with and investment in them.

Allowing a non-biological parent to recover damages for developing a close relationship with a child misrepresented to be his and performing parental acts is not a damage which should be compensable under the law. The Court does not condone the alleged behavior of the Defendant, but

the misrepresentations and omissions alleged are betrayals for which the law should not provide a remedy. . . .

The Court[']s ruling is limited to the facts of the instant case. It is not necessary to reach the broader issue of whether parties should be able to bring claims for intentional infliction of emotional distress and fraud when such suits are predicated on an action for divorce. It is the Court's belief, however, that such actions should be prohibited in the interest of judicial economy and the efficient administration of justice. As every trial judge knows, if such claims are allowed there will be two suits in every divorce—one at law and one in equity. Perhaps Judge Henderson in the *Pickering* case said it best: "where a man and wife are involved in a marriage relationship, there could always exist a tort for intentional infliction of emotional distress where they had an argument. It could be over the family dog, who takes out the garbage, who forgot to pay the bills or who is spending too much money. In other words the law should not provide a basis for interfamilial warfare between husbands and wives where our courts would be flooded with litigation." [*Pickering v. Pickering*, 434 N.W.2d 758, 764 (S.D. 1989) (Henderson, J. concurring in part, dissenting in part)]. This is not to suggest that the allegations in the instant case equate to an argument over the family dog or taking out the trash, but the traumas spouses inflict upon each other in today's world are often heinous and all too common. It is simply not practical to allow these claims to be litigated as intentional torts when a remedy can be provided within the divorce action.

We disagree with the trial court. First, given that Maryland has abrogated interspousal immunity for intentional torts, we reject the court's conclusion that public policy regarding the best interests of the children precludes this particular interspousal tort claim. Second, we do not agree that a divorce action will provide Mr. Doe a complete remedy for his claims if proven. We explain.

## Abrogation of Interspousal Immunity

The common law doctrine of interspousal immunity was predicated on the concept of a husband and wife as one legal entity. *Thompson v. Thompson*, 218 U.S. 611, 614, 31 S.Ct. 111, 54 L.Ed. 1180 (1910). Because a wife's legal identity merged with her husband's upon marriage, married women were unable to enter into contracts, own property, sue or be sued. *Id.* at 614–15, 31 S.Ct. 111. The legal fiction of husband and wife as one entity precluded suits between spouses. *Id.* at 615, 31 S.Ct. 111. As the Court of Appeals explained:

The disabilities formerly existing insofar as women are concerned are difficult for those of us of the present generation to fully comprehend. It seems hard to believe that prior to the adoption of the 19th Amendment of the Constitution of the United States in 1920 women were not permitted to vote in Maryland and many other states. Prior to the enactment of Chapter 399 of the Acts of 1902 they were not permitted to practice law in Maryland. *See In Re Maddox*, 93 Md. 727, 50 A. 487 (1901). Deeds are to be found among the land records of some of our counties in which acknowledgments appear referring to the examination of the wife out of the presence of her husband by the person taking the acknowledgment.

Judge Richard Grason in *Barton v. Barton*, 32 Md. 214, 224 (1870), is authority for the fact that at common law "a debt due by the husband to the wife for money lent before marriage, became extinguished by the marriage." In that case he said for the Court:

"[P]ublic policy, originating in the delicate relation existing between husband and wife, forbids a wife from maintaining an action at law against her husband during the coverture, and her only remedy against him is by a proceeding in equity." *Id.* at 224.

In *David v. David*, 161 Md. 532, 534, 157 A. 755, 756 (1932), Judge Offutt said for the Court, "The rule at common law is that a married woman cannot maintain an action

against her husband for injuries caused by his negligent or tortious act. 30 *C.J., 'Husband and Wife,'* secs. 317, 675." He went on to say, referring to the same citation and also to *Philips v. Barnet,* 1 Q.B.D. 436 (1876), that "[t]he reason usually given for that rule is the presumed legal identity of the husband and wife. . . ." Background for this is found in 1 W. Blackstone, *Commentaries* some 200 years ago:

> "By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and *cover,* she performs everything; and is therefore called in our law-french a *feme-covert, foemina viro co-operta;* is said to be *covert-baron,* or under the protection and influence of her husband, her *baron,* or lord; and her condition during her marriage is called her *coverture.* Upon this principle, of a union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage." *Id.* at * 442 (italics in original).

He adds, in discussing the consequences of this union of husband and wife, "If the wife be injured in her person or her property, she can bring no action for redress without her husband's concurrence, and in his name, as well as her own: neither can she be sued without making the husband a defendant." *Id.* at * 443.

*Lusby v. Lusby,* 283 Md. 334, 337–38, 390 A.2d 77 (1978).

The passage of Married Women's Acts in the 1800s significantly weakened the legal fiction of "the union of person in husband and wife." These Acts, passed in most states, gave women a separate legal identity with the right to contract, own property, and maintain separate legal actions. *See* Stacey S. Kawasaki, *Interspousal Torts: a Procedural Framework for Hawai'i,* 19 U. Haw. L.Rev. 377, 378–79 (1997). Chapter 457 of the Acts of 1898, later codified in Article 45, § 5, and now contained in Md.Code (1984, 1991 Repl.Vol., 1997 Supp.), § 4–201 to 206 of the Family Law Article, revised

Maryland's law regarding spouses' legal rights. Section 4–204 provides:

### § 4–204. Married woman's right to deal as if unmarried.

A married woman may do any of the following, as if she were unmarried:

(1) engage in business;

(2) make a contract with any person, including her husband, whether or not she is engaged in business;

(3) bind herself and her assigns by a covenant running with or related to real property or chattels real deeded to her on or after March 19, 1867;

(4) form a partnership with any person, including her husband;

(5) sue on any contract, including a contract made with her husband;

(6) sue for the recovery, security, or protection of her property;

(7) sue for any tort committed against her; and

(8) appoint counsel to represent her in an action brought under § 4–205(b) or (c) or § 4–301(b) of this title.

Section 4–205 provides, in part:

### § 4–205. Right to deal with married woman as if unmarried.

(a) *Husband's right.*—A husband may sue his wife on a contract made with her, as if she were unmarried.

(b) *Rights of a third person—In general.*—

(1) A third person may take any of the following actions with or against a married woman, as if the married woman were unmarried:

(i) make a contract;

(ii) sue on the contract, whether the contract was made before or during the woman's marriage;

(iii) sue for a tort, whether the woman committed the tort before or during her marriage; and

(iv) execute on a judgment.

(2) A third person may maintain an action at law or in equity against a married woman in her married name.

Until *Lusby*, Maryland courts did not interpret these provisions as allowing spouses to sue one another in tort. *Lusby*, 283 Md. at 358, 390 A.2d 77. In *Furstenburg v. Furstenburg*, 152 Md. 247, 136 A. 534 (1927), Ms. Furstenburg brought an action against her husband for injuries she suffered in an automobile accident. *Id.* at 248, 136 A. 534. Rejecting the argument that Section 5 of Article 45 allowed an interspousal tort suit, the *Furstenburg* Court relied on *Thompson v. Thompson*, 218 U.S. 611, 31 S.Ct. 111, 54 L.Ed. 1180 (1910), in which the Supreme Court construed a similar District of Columbia statute. *Furstenburg*, 152 Md. at 249, 136 A. 534. The *Furstenburg* Court concluded that "[t]he statute was not intended to give a right of action as against the husband, but to allow the wife, in her own name, to maintain actions of tort which, at common law, must be brought in the joint names of herself and husband." *Id.* at 251, 136 A. 534 (quoting *Thompson*, 218 U.S. at 617, 31 S.Ct. 111). The Court found that

[i]t appears to have been the purpose of the Act of 1898 to give the wife a remedy, by her suit alone, for actionable wrongs which could not theretofore be thus independently redressed. *The intention to create, as between husband and wife, personal causes of action, which did not exist before the act, is not, in our opinion, expressed by its terms.*

*Furstenburg*, 152 Md. at 252–53, 136 A. 534 (emphasis added).

Several years later, in *David v. David*, 161 Md. 532, 157 A. 755 (1932), the Court again concluded that the rights afforded spouses in Article 45, Section 5 did not include the ability to sue each other in tort:

The rule at common law is that a married woman cannot maintain an action against her husband for injuries caused by his negligent or tortious act. The reason usually given for that rule is the presumed legal identity of the husband and wife, and some confusion has arisen from the adoption of the legislation which has had the effect of partially dissipating that fiction by permitting suits between husband

and wife to enforce contractual liabilities, by according to each the same rights and privileges in respect to property they would have if unmarried, by permitting the wife to carry on a trade or business, and to receive and enjoy her earnings from any source as freely as if single, and to sue in her own name for torts against her. Coincident with the widening scope and extent of such legislation, there has been a determined effort to have it construed so as to permit actions between husband and wife for damages resulting from some wrongful or negligent act of the defendant, and in some jurisdictions it has been so construed, usually on the ground that, with the disappearance of the fiction of identity, the reason for the rule denying persons in the relation of husband and wife the right to sue each other in tort ceased. But that view has been rejected by what seems to be the weight of authority, not only upon the technical and artificial ground that the identity of husband and wife persists in its original vigor until it has been completely dissolved by express legislative mandate, in respect to all matters which the Legislature has not expressly included within the meaning of the emancipatory statutes, but upon the broader sociological and political ground that it would introduce into the home, the basic unit of organized society, discord, suspicion and distrust, and would be inconsistent with the common welfare.

*David,* 161 Md. at 534–35, 157 A. 755 (citations omitted).

In *Gregg v. Gregg,* 199 Md. 662, 87 A.2d 581 (1952), the Court rejected the *David* Court's reasoning as artificial, explaining that

[i]t applies to a post-bellum situation a theory which is clearly only applicable to conditions prior to the difficulty which caused the bringing of the legal action. After discord, suspicion and distrust have entered the home, it is idle to say that one of the parties shall not be allowed to sue the other because of fear of bringing in what is already there.

*Id.* at 667, 87 A.2d 581.

The Court concluded, nevertheless, that "these ancient theories which form a part of the common law have to be followed

by us unless they have been changed by legislative action, and the clear import of the decision in the *David* case is that the emancipatory statutes must be strictly construed." *Id.* The following year the Court reiterated that "[i]t is clear that Maryland will not entertain a suit by one spouse against the other for his or her tort, committed during the marital status." *Tobin v. Hoffman,* 202 Md. 382, 391, 96 A.2d 597 (1953).

In *Lusby,* however, the Court changed the rule. *See Lusby,* 283 Md. at 358, 390 A.2d 77. In *Lusby,* Ms. Lusby's husband carjacked her at gunpoint, assaulted and raped her, then helped two of his friends try to rape her. *Id.* at 336, 390 A.2d 77. Ms. Lusby then sued her husband in tort. The trial court dismissed the action on the basis of interspousal immunity. *Id.* In reversing the trial court, the Court of Appeals looked to other states for guidance regarding the abrogation of interspousal immunity for tort actions. The Court quoted *Lewis v. Lewis,* 370 Mass. 619, 351 N.E.2d 526 (1976), in which the Massachusetts Supreme Court stated:

> "We conclude therefore that it is open to this court to reconsider the common law rule of interspousal immunity and, having done so, we are of opinion that it should no longer bar an action by one spouse against another in a case such as the present one. We believe this result is consistent with the general principle that if there is tortious injury there should be recovery, and only strong arguments of public policy should justify a judicially created immunity for tortfeasors and bar to recovery for injured victims."

*Lusby,* 283 Md. at 347, 390 A.2d 77 (quoting *Lewis,* 351 N.E.2d at 532). The *Lusby* Court further noted:

> Although the courts have been divided on this issue, the commentators have been nearly unanimous in their criticism of the common law rule of immunity. *See, e.g.,* W. Prosser, *Handbook of the Law of Torts,* § 122 (4th ed. 1971) (At 864 Prosser states, "The devastating attack on the old rule found in a number of recent decisions seems to leave no possible justification for it except that of historical survival."); 1 F. Harper & F. James, *The Law of Torts* § 8.10

(1956) (At 645 the authors state, "The rule denying recovery has been applied literally and blindly in many cases where the reason for the rule could not possibly apply inasmuch as there was no home to disrupt and no domestic harmony to disturb." At 646 they state, "The metaphysical and practical reasons which prevented such actions at common law are no longer applicable."); and McCurdy, *Personal Injury Torts Between Spouses*, 4 Vill. L.Rev. 303 (1959). In the latter article Professor McCurdy states:

> "There is no reason to think that in the case of intentional, wilful, and wanton injury an action would disrupt domestic harmony, since the conduct leading to the action has already caused the disruptions; and indeed there is every reason to think that denial of an action might be more disruptive in that it might lead to resort to other admittedly available redress such as to be found in the criminal and divorce law. Besides, a substantial number of states have for years allowed such interspousal tort actions either by decision or by express statute and it would be impossible to demonstrate that more domestic disharmony exists because of it."

*Lusby*, 283 Md. at 350–51, 390 A.2d 77 (footnote omitted). The *Lusby* Court observed: "[I]n none of the prior Maryland cases has there been an allegation of an intentional tort, much less the outrageous conduct here set forth. Moreover, at no time since *Furstenburg* has the Court examined the foundation upon which our holdings rest." *Id.* at 352, 390 A.2d 77 (citation omitted). The Court then recalled the U.S. Supreme Court's 1910 decision in *Thompson*, and concluded that Justice Harlan's dissent, in which Justices Holmes and Hughes joined, was more persuasive than the majority opinion. *Id.* The *Lusby* Court quoted Justice Harlan:

> "In my opinion these statutory provisions, properly construed, embrace such a case as the present one.... The statute enables the married woman to take, as her own, property of any kind, no matter how acquired by her, as well as the avails of her skill, labor or personal exertions, 'as absolutely *as if she were unmarried.*' It then confers upon

married women the power to engage in any business, no matter what, and to enter into contracts, whether engaged in business or not, and to sue separately upon those contracts. If the statute stopped here, there would be ground for holding that it did not authorize this suit. But the statute goes much farther. It proceeds to authorize married women 'also' to sue separately for the recovery, security or protection of their property; still more, they may sue, separately, 'for *torts* committed against Them, as fully and freely *as if they were unmarried.*' No discrimination is made, in either case, between the persons charged with committing the tort. No exception is made in reference to the husband, if he happens to be the party charged with transgressing the rights conferred upon the wife by the statute. In other words, Congress, by these statutory provisions, destroys the unity of the marriage association as it had previously existed. It makes a radical change in the relations of man and wife as those relations were at common law in this District. In respect of business and property the married woman is given absolute control; in respect of the recovery, security and protection of her property, she may sue, separately, in *tort*, as if she was unmarried; and in respect of herself, that is, of her person, she may sue, separately, as fully and freely, as if she were unmarried, 'for *torts* committed *against her.*' So the statute expressly reads. But my brethren think that notwithstanding the destruction by the statute of the unity of the married relation, it could not have been intended to open the doors of the courts to accusations of all sorts by husband and wife against each other; and, therefore, they are moved to add, by construction, to the provision that married women may 'sue separately ... for torts committed against them as fully and freely as if they were unmarried' these words: 'Provided, however, that the wife shall *not* be entitled, in any case, to sue her husband separately for a tort committed *against her person.*' "

*Lusby,* 283 Md. at 354–55, 390 A.2d 77 (emphasis in original)(quoting *Thompson,* 218 U.S. at 621–23, 31 S.Ct. 111). The *Lusby* Court then concluded:

Much of what Mr. Justice Harlan said in his dissent in *Thompson* could be said by way of analysis of the Maryland act, as Judge Hammond implied for the Court in *Fernandez*, 214 Md. at 524, 135 A.2d 886, when he indicated that the literal language of Art. 45, § 5 would authorize the type of suit we here have before us. *Thompson* was decided nine years before the adoption of the 19th Amendment and *Furstenburg*, eight years after its adoption. One senses in *Thompson* a reluctance to permit change. Certainly Justices Harlan, Holmes, and Hughes, the dissenters in *Thompson*, constituted three of the great minds of the Supreme Court of the United States in 1910.

We can conceive of no sound public policy in the latter half of the 20th-century which would prevent one spouse from recovering from another for the outrageous conduct here alleged. There certainly can be no domestic tranquility to be preserved in the face of allegations such as we have before us. It will be recalled that in *Gregg*, 199 Md. at 667, 87 A.2d 581, Chief Judge Marbury said for the Court, "After discord, suspicion and distrust have entered the home, it is idle to say that one of the parties shall not be allowed to sue the other because of fear of bringing in what is already there." It will further be recalled that he labeled as "artificial" the theory that "the identity of husband and wife persists in its original vigor until it has been completely dissolved by express legislative mandate...."

The General Assembly has not heeded the suggestions by this Court that a new statute be enacted. Insofar as the interpretation to be given to the present statute is concerned, we have said many times that the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent, and in ascertaining that intent the court considers the language of an enactment in its natural and ordinary signification. *See, e.g., Howell v. State*, 278 Md. 389, 392, 364 A.2d 797 (1976), and the cases there cited. For purposes of our decision here today, however, we need not be involved with statutory construction nor need we be

involved with our prior cases other than for dicta appearing in them to the effect that one spouse may not sue another for tort. None of our prior cases has involved an intentional tort. We find nothing in our prior cases or elsewhere to indicate that under the common law of Maryland a wife was not permitted to recover from her husband in tort when she alleged and proved the type of outrageous, intentional conduct here alleged. Note that under the common law in England as reflected in Blackstone it was under "the *old* common law" that a husband "might give his wife moderate correction." (Emphasis added.) The type of action in the case at bar not being forbidden by the common law of this State or any statute of this State, it follows that the trial court erred.

*Lusby*, 283 Md. at 357–58, 390 A.2d 77 (footnote omitted).

In the next case to address interspousal immunity, *Linton v. Linton*, 46 Md.App. 660, 420 A.2d 1249 (1980), this Court observed that "Maryland has steadfastly adhered to the common law doctrine of interspousal immunity in tort cases." *Id.* at 664, 420 A.2d 1249. The Court nevertheless acknowledged that "in *Lusby v. Lusby*, [the Court of Appeals] recognized an exception to the doctrine whenever the tort committed against the spousal victim is not only intentional, as in assault and battery, but "outrageous," as where the errant spouse's conduct transcends common decency and accepted practices." *Linton*, 46 Md.App. at 664, 420 A.2d 1249 (citation omitted). The Court pointed out that the holding in *Lusby*, which was limited to what it characterized as "outrageous, intentional torts," represented merely a "small gap" in the rule of interspousal immunity. *Id.*

A few years later, however, the Court of Appeals created a chasm out of the small gap when it expanded the abrogation of interspousal immunity to negligence cases. *Boblitz v. Boblitz*, 296 Md. 242, 275, 462 A.2d 506 (1983). The Court reviewed decisions in the few states retaining the interspousal immunity doctrine and reviewed decisions from the states that had

abrogated the doctrine fully and partially.[3] *Id.* at 253–75, 462 A.2d 506. The Court quoted the Restatement (Second) of Torts, which approved abrogation of the doctrine:

"Section 895F. Husband and Wife

(1) A husband and wife is not immune from tort liability to the other solely by reason of that relationship.

\* \* \* \*

Comment:

\* \* \* \*

f. Abrogation. The last two decades have witnessed the definite rejection and abolition of the immunity between husband and wife in its entirety in a substantial number of jurisdictions. Numerous courts have followed a dissenting opinion of Mr. Justice Harlan in *Thompson v. Thompson*, (1910) 218 U.S. 611 [31 S.Ct. 111, 54 L.Ed. 1180], and have held that the Married Women's Acts and the position of equality in which they were intended to place the spouses have removed all reason and justification for the immunity, and that one spouse is subject to liability to the other for any tort whether it is to property or to the person. The number of these decisions has been on the increase in recent years and has been encouraged by the spread and general use of liability insurance, particularly in automobile cases. The indications are clear that this is the future state of the law in all states...."

*Id.* at 271–72, 462 A.2d 506 (quoting Restatement (Second) of Torts § 895F).

The Court then discussed *Lusby* and concluded:

---

**3.** In 1983, 27 states had abrogated the doctrine fully and 8 partially. Kawasaki, *supra,* 19 U. Haw. L.Rev. at 381–82. By 1997, interspousal immunity had been completely abrogated in 45 states and the District of Columbia, and 5 states had abrogated the immunity in limited circumstances (Georgia, Massachusetts, Nevada, Rhode Island, Vermont). *Id.*

In capsulation, the opinion in *Lusby, supra,* pointed out (1) the current invalidity of the disabilities imposed upon women by the original rule of law; (2) that the great minds of Supreme Court Justices Harlan, Holmes and Hughes had dissented from the narrow interpretation of the District of Columbia Married Womens [sic] Act in *Thompson v. Thompson, supra;* (3) that Chief Judge Marbury [in *Gregg* ]was rightly critical of the reasons for decision in the early cases; (4) that Judge Hammond's observation [in *Fernandez* ] that the literal language of Article 45, Section 5 would authorize tort actions was quite correct and in accord with the view of the dissenters in *Thompson, supra;* and (5) that since the decision in *Stokes [v. Taxi Operators Ass'n,* 248 Md. 690, 237 A.2d 762] in 1968 there has been a parade of cases in which courts have altered the previous common law rule.

*Boblitz,* 296 Md. at 272–73, 462 A.2d 506 (footnotes omitted). Noting that the *Lusby* Court found it unnecessary to rule upon the question of the continuing viability of the interspousal immunity rule in general negligence cases, the Court stated:

In the subject case the issue whether the rule [of interspousal immunity] continues to be viable is clearly before us. We share the view now held by the vast majority of American States that the interspousal immunity rule is unsound in the circumstances of modern life in such cases as the subject. It is a vestige of the past. We are persuaded that the reasons asserted for its retention do not survive careful scrutiny. They furnish no reasonable basis for denial of recovery for tortious personal injury. We find no subsisting public policy that justifies retention of a judicially created immunity that would bar recovery for injured victims in such cases as the present.

*Id.* at 273, 462 A.2d 506.

Although "mindful of the value of the doctrine of *stare decisis* and aware that for reasons of certainty and stability, changes in decisional doctrine ordinarily should be left to the Legislature," *id.* at 273, 462 A.2d 506, the Court pointed out

that "[t]he doctrine of *stare decisis,* important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule has become unsound in the circumstances of modern life." *Id.* at 274, 462 A.2d 506 (quoting *White v. King,* 244 Md. 348, 354, 223 A.2d 763 (1966)). The Court concluded:

> In cases such as the present we have no legislative barrier to abrogation of this outmoded rule of law. Indeed, after legislative passage and approval by the people of Article 46 of the Declaration of Rights any ancient deprivation of rights based upon sex would contravene the basic law of this State.
>
> By the same token, we recognize that "conduct, tortious between two strangers, may not be tortious between spouses because of the mutual concessions implied in the marital relationship." Decision in such cases necessarily will be determined on a case to case basis.

*Id.* at 274–75, 462 A.2d 506 (citation omitted).

This Court further defined the limits of the interspousal immunity doctrine in *Bender v. Bender,* 57 Md.App. 593, 471 A.2d 335 (1984), explaining that "[a]lthough *Lusby* does not explicitly define the extent of the change it directs in the law of interspousal immunity, preferring a case by case approach, it clearly paves the way for such actions involving intentional infliction of personal injury." *Id.* at 600–01, 471 A.2d 335. Implicitly rejecting the analysis in *Linton,* the *Bender* Court declared that

> Judge Smith's use of the word "outrageous" aptly describes the nature of the offense in *Lusby.* The use of a descriptive adjective, however, does not require that the same word be grafted upon each succeeding tortious act in order to establish a cause of action.
>
> We believe the Court's primary focus in *Lusby* was its recognition that henceforth in Maryland intentional torts would form a basis for interspousal suits at law.... The use of the word "outrageous," in our view, appropriately characterized the offense, but the Court was sanctioning

claims for intentional torts and not claims limited to outra-
geous torts.... The severity [of the tort] is a matter of
damages, not of liability.

*Id.* at 601–02, 471 A.2d 335. The Court then affirmed the trial
court's "finding that an intentional tort was committed under
circumstances which render legally inappropriate the interpo-
sition of interspousal immunity." *Id.* at 602, 471 A.2d 335.

A review of *Lusby, Boblitz,* and *Bender* leads us to
the conclusion that interspousal tort suits are now permitted
in Maryland in both negligence and intentional tort cases.
Neither *Lusby* nor *Bender* indicates which cases, under the
suggested "case-by-case" approach, would be precluded, or on
what basis. Nothing in the previous decisions indicates that
the particular claim at issue in this case, intentional infliction
of emotional distress, would be precluded. As one commenta-
tor suggested, "[t]herefore, in most states it may now be
argued that it 'logically' follows from the end of [interspousal]
immunity that, because section 46 torts [intentional infliction
of emotional distress] are generally recognized, they should be
available to spouses as well, or at least that the burden of
persuasion lies with those who reject this position." Ira Mark
Ellman and Stephen D. Sugarman, *Spousal Emotional Abuse
as a Tort,* 22 Md. L.Rev. 1268, 1283 (1996).

In this case, as with most other domestic tort cases, discord,
suspicion, and distrust have already entered the Doe home.
The historic public policy rationale precluding interspousal
suits seems inane when there is no home to disrupt and no
domestic tranquility left to preserve. Interspousal immunity
is as much a vestige of the past in this instance as in the
circumstances considered in *Lusby* and *Boblitz.* The Court of
Appeals has not carved out an exception to the abrogation of
interspousal immunity for intentional infliction of emotional
distress or fraud, and neither shall we.

### The Best Interests of the Children

The trial court in the case *sub judice* followed a
different path of logic than we follow. The trial court read

into *Lusby*'s pronouncement that "no sound public policy in the latter half of the 20th-century ... would prevent one spouse from recovering from another for the ... conduct ... alleged" an implicit statement that as yet unidentified and sound public policy considerations *may* preclude interspousal suits for intentional torts in cases such as this one. The trial court stretched the scope of this interspousal suit to envelop the entire family unit, and concluded that regardless of the abrogation of interspousal immunity, public policy regarding the children mandated a dismissal of this action. We find unpersuasive the circuit court's reliance on "the best interests of the children" as a public policy basis to preclude this interspousal suit for fraud and intentional infliction of emotional distress.

In barring Mr. Doe's suit as a matter of public policy, the circuit court relied primarily on *Pickering v. Pickering*, 434 N.W.2d 758 (S.D.1989). In *Pickering*, Ms. Pickering had an affair with a co-worker and became pregnant. *Id.* at 760. She then seduced her husband so that he would believe he was the father of the child. *Id.* The truth came out when the child was four months old, whereupon Mr. Pickering filed for divorce and commenced a tort action against Ms. Pickering and her paramour. *Id.* In his tort action Mr. Pickering alleged intentional infliction of emotional distress, fraud and deceit, negligent misrepresentation, tortious interference with a marital contract, and alienation of affections. *Id.*

Regarding the claim for intentional infliction of emotional distress, the *Pickering* court baldly asserted, "[w]e believe the tort of intentional infliction of emotional distress should be unavailable as a matter of public policy when it is predicated on conduct which leads to the dissolution of a marriage." *Id.* at 761. In Maryland, however, the Court of Appeals has not limited interspousal tort suits in such a way as to exclude those suits in which the defendant's conduct leads to the dissolution of a marriage. *See Lusby*, 283 Md. at 357, 390 A.2d 77. In *Lusby*, for example, where the husband forced his wife's car off the road, hit her, forcibly raped her, and helped two of his friends try to rape her, the Court of Appeals did not

appear concerned that the suit arose from conduct that could end the parties' marriage, acknowledging that "[t]here certainly can be no domestic tranquility to be preserved in the face of allegations such as we have before us." *Id.* We find the *Pickering* court's rationale unpersuasive.

The *Pickering* court denied relief to the husband for another reason as well: In South Dakota, an action for alienation of affections provides a remedy for intentional infliction of emotional distress, thus a separate action is not necessary. *Id.* In Maryland, however, the cause of action for alienation of affections has been abolished. *Miller v. Ratner,* 114 Md.App. 18, 35, 688 A.2d 976, *cert. denied,* 345 Md. 458, 693 A.2d 355 (1997).

As to Mr. Pickering's claim of fraud and deceit, the court also concluded that the claim should be barred as a matter of public policy. *Pickering,* 434 N.W.2d at 761. The *Pickering* court relied on *Richard P. v. Superior Court,* 202 Cal.App.3d 1089, 249 Cal.Rptr. 246 (1988), in which the California court, after considering a similar action, concluded that

any wrong which has occurred as a result of [the defendant's] actions is not one that can be redressed in a tort action. We do not doubt that this lawsuit emanated from an unhappy situation in which the real parties in interest suffered grief. We feel, however, that the innocent children here may suffer significant harm from having their family involved in litigation such as this and that this is exactly the type of lawsuit which, if allowed to proceed, might result in more social damage than will occur if the courts decline to intervene. "We do not believe that the law should provide a basis for such interfamilial warfare."

*Pickering,* 434 N.W.2d at 761–62 (citing *Richard P.,* 202 Cal.App. 3d at 1094, 249 Cal.Rptr. 246). The *Pickering* court worried that allowing Mr. Pickering to maintain his suit could cause the child "to suffer significant harm" and concluded that "[t]his innocent party, who is now three years old, should not be subjected to this type of 'interfamilial warfare.'" *Pickering,* 434 N.W.2d at 762. Relying on this analysis, the trial

court in the instant case determined that allowing Mr. Doe to proceed with his tort claims would not be in the best interests of the twins.

We consider "the best interests of the children" to be a red herring[4] in the analysis of whether to permit an interspousal suit for intentional infliction of emotional distress, fraud, and deceit. Although this sometimes elusive doctrine is usually an important consideration in most family law matters, the counts of the complaint with which this appeal is concerned do not implicate this doctrine. This is not a child custody case, where the appropriate standard *is* the best interest of the child. *See Taylor v. Taylor,* 306 Md. 290, 303, 508 A.2d 964 (1986). Here, the children are neither parties nor witnesses in the counts of the complaint at issue here; therefore, the standard does not apply.

We note that in the instant case, there is no question regarding paternity. The DNA tests show that Mr. Doe is not the father of the twins. Thus, contrary to Ms. Doe's argument, this is not a case in which "it would not be in the child's best interest to have the blood tests reveal that a man who has been the *de facto* father in the whole of the child's life is not the biological father...." *Monroe v. Monroe,* 329 Md. 758, 767, 621 A.2d 898 (1993). Here, the blood tests have been performed and the results announced; it is a *fait accompli.*

In a case similar to the one at hand, where the child's mother deliberately misrepresented to the plaintiff for eight years that he was the child's father, the Illinois court rejected the "best interest of the child" as a basis for precluding a suit for intentional infliction of emotional distress. *Koelle v. Zwiren,* 284 Ill.App.3d 778, 220 Ill.Dec. 51, 58, 672 N.E.2d 868, 875

---

4. According to the Oxford English Dictionary, the term "red herring" arose in the 1680s as a hunting term whereby a red herring would be drawn across the fox's path to destroy the scent and set the dogs at fault. The Compact Oxford English Dictionary 1535 (2d ed.1991). The phrase "neither fish, flesh, nor good herring" also gained popularity, as explained in the Dictionary of Phrase and Fable as "something insipid and not good eating[,] neither one thing nor another." Both definitions seem pertinent in the present case.

(1996). The Court stated that the "[d]efendant claims that public policy disfavors plaintiff's lawsuit because 'intrafamilial warfare' may be harmful to the child." *Id.* The Illinois court concluded, however, that "any harm [the child] may have suffered from this alleged situation would have been caused by defendant.... If anything, plaintiff's lawsuit seeks to limit the harm caused [and to allow] plaintiff and [the child] to continue their loving father-daughter relationship." *Id.* Here, as well, despite Ms. Doe's allegedly duplicitous conduct, Mr. Doe proposes to maintain a loving and close relationship with the twins, and he has requested permanent custody of them.

Furthermore, the innocent parties in this case, the twins, will not be subjected to any more intrafamilial warfare in a tort action than that which would be present during the companion divorce action. Many of the same factual allegations regarding Ms. Doe's alleged deception will be presented during the divorce. Because the Court of Appeals has abrogated interspousal immunity in intentional tort cases without mentioning any reservation for cases in which the parties happen to have children, and because we find the "best interests of the children" are not more implicated by the claims before us than similar claims in a divorce proceeding, we find no public policy reason to preclude this interspousal tort suit. As the Illinois Court of Appeals stated in *Koelle:* "We find that public policy does not serve to protect people engaging in behavior such as that with which plaintiff's complaint charges defendant, and we will not allow defendant to use her daughter to avoid responsibility for the consequences of her alleged deception." *Koelle,* 220 Ill.Dec. at 58, 672 N.E.2d at 875. Here, too, Ms. Doe cannot use the twins as a shield in order to avoid potential liability for her allegedly tortious conduct towards her husband.

## Availability of Remedy Through Divorce Suit (Count I)

When dismissing Mr. Doe's tort claims, the trial court reasoned that Mr. Doe "is not without a remedy," finding that "[t]he conduct of [Ms. Doe] ... will impact on the Court's willingness to grant a monetary award. [Mr. Doe] can be

compensated for the wrongs he has suffered without litigating these issues again in tort." The court then concluded that "[i]t is simply not practical to allow these claims to be litigated as intentional torts when a remedy can be provided within the divorce action." We disagree.

 Tort actions and divorce proceedings are intended to effect different purposes, with different remedies. The Court of Appeals recognized this distinction in *Boblitz:*

> "[N]o court in this day and age subscribes seriously to the view that the abrogation of marital immunity for tortious injury is 'unnecessary' because redress for the wrong can be obtained through other means. This additional, 'alternative remedy' theory was advanced generations ago as a justification for retaining interspousal tort immunity in *Thompson v. Thompson,* and was even then the subject of dissent. The criminal law may vindicate society's interest in punishing a wrongdoer but it cannot compensate an injured spouse for her or his suffering and damages. *Divorce or separation provide escape from tortious abuse but can hardly be equated with a civil right to redress and compensation for personal injuries.*"

*Boblitz,* 296 Md. at 267, 462 A.2d 506 (citations omitted) (emphasis added) (quoting *Merenoff v. Merenoff,* 76 N.J. 535, 388 A.2d 951, 962 (1978)). Regarding the difference in remedies, one scholar explained:

> "A tort action is not based on the same underlying claim as an action for divorce. The purpose of a tort action is to redress a legal wrong in damages; that of a divorce action is to sever the marital relationship between the parties, and where appropriate, to fix the parties' respective rights and obligations with regard to alimony and support, and to divide the marital estate. Although a judge in awarding alimony and dividing marital property must consider, among other things, the conduct of the parties during the marriage, the purpose for which these awards are made do not include compensating a party in damages for injuries suffered. The purpose of an award of alimony is to provide economic

support to a dependent spouse, that of the division of marital property is to recognize and equitably recompense the parties' respective contributions to the marital relationship."

Andrew Schepard, *Divorce, Interspousal Torts, and Res Judicata,* 24 Fam. L.Q. 127, 131 (1990) (quoting *Heacock v. Heacock,* 402 Mass. 21, 520 N.E.2d 151, 153 (1988)). Because the divorce action simply divides the assets of the marriage, while the interspousal tort suit " 'impose[s] on married parties accountability for their actions to the same extent imposed on other members of society[,]' . . . the injured spouse should be adequately compensated in both proceedings, for the injuries received as a result of the tort and for his or her contributions to the marriage." Kawasaki, *supra,* at 419–20 (quoting Barbara H. Young, *Interspousal Torts and Divorce: Problems, Policies, Procedures,* 27 J. Fam. L. 489, 511 (1988–89)). Here, the trial court intellectually merged the two actions, concluding that a marital award could compensate Mr. Doe for both the tort injuries and his contributions to the marriage.

■ After a review of the Family Law Article provisions regarding monetary awards, however, we find that limiting Mr. Doe's remedy to a possible marital award may not fully compensate him for his claimed tort injuries. When calculating a monetary award, the court must apply a three-step analysis. First, the court must characterize all property owned by the parties as either marital or non-marital. Md. Code (1984, 1991 Repl.Vol., 1997 Supp.), § 8–203 of the Family Law Article ("FL"). Second, the court must determine the value of all marital property. FL § 8–204. Finally, the trial court may "grant a monetary award . . . as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded." FL § 8–205(a). The court must take into account the following factors in determining the amount:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

*(4) the circumstances that contributed to the estrangement of the parties;*

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the marital property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both;

(9) The contribution by either party of property described in § 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

*(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both.*

FL § 8–205(b) (emphasis added). Sections 8–205(b)(4) and (11) seem to suggest that the court may consider Ms. Doe's allegedly deceitful conduct and make a fair and equitable monetary award to Mr. Doe accordingly. But the decision to make a monetary award is a discretionary one. Therefore nothing compels the trial court to make any award to Mr. Doe. Even if the court does order a monetary award, however, Mr. Doe may still not be made whole, because a monetary award is limited to the amount of the marital property. *Watson v. Watson,* 77 Md.App. 622, 639, 551 A.2d 505 (1989).

Section 8–202(a)(3) "expressly prohibits the divorce court from transferring ownership of property, real or personal, from one spouse to the other.... [Thus, a monetary award

may only be made] provided there is sufficient marital proper-
ty to support such an award." *Kline v. Kline*, 85 Md.App. 28,
44, 581 A.2d 1300 (1990). As we stated in *Watson*, "the right
to a monetary award pursuant to § 8–205 is not an interest in
the estate or property of one's spouse. Rather, it is a remedy
provided to divorcing spouses to seek financial compensation
to cure inequity in the distribution of property acquired during
the marriage according to how that property is titled." *Id.* at
634, 551 A.2d 505. We have also held that if the spouse to
whom the court intends to grant a monetary award already
owns, and thus retains, any marital property, the award
cannot exceed the value of the marital property owned by the
other spouse. *Jandorf v. Jandorf*, 100 Md.App. 429, 441, 641
A.2d 971 (1994).

Marital property is defined as "the property, however titled,
acquired by 1 or both parties during the marriage." FL § 8–
201(e)(1). Excluded from the definition of marital property is
property acquired before the marriage; acquired by inheri-
tance or gift from a third party; excluded by valid agreement;
or directly traceable to any of these sources. FL § 8–
205(e)(3). The Court of Appeals has explained that this
section,

> which sets forth an exclusive list of nonmarital property,
> indicates a legislative intent that the value of certain proper-
> ty not be subject to equitable distribution, and that the
> interests of spouses making nonmonetary contributions be
> protected without depriving the other spouse of nonmarital
> property. To permit nonmarital property to be "transmut-
> ed" into marital property and, therefore, to be subject to
> equitable distribution deprives a spouse of nonmarital prop-
> erty and is, therefore, contrary to that legislative intent.

*Harper v. Harper*, 294 Md. 54, 80, 448 A.2d 916 (1982).
Therefore, any potential monetary award will be circum-
scribed by the pool of assets that constitute the marital
property. Here, Mr. Doe alleged that Ms. Doe has "substan-
tial common stockholdings" but does not describe the amount
or value of the couple's marital property. Based on allega-
tions in the complaint, it is reasonable to infer that Ms. Doe's

stocks may be nonmarital property. If the parties have no marital property, the court cannot order a marital award, Ms. Doe's nonmarital property notwithstanding. Even if the parties do have marital property, the trial court may decide not to make a marital award or to make an award that is insufficient to compensate Mr. Doe for his claimed tort injuries. Given the procedural posture in which the instant case reaches us, and the undeveloped state of the record as to the divorce action, we cannot say with certainty that a monetary award could satisfy Mr. Doe's claimed tort-based injuries.

If, however, Mr. Doe's tort action proceeds, he may be able to reach Ms. Doe's nonmarital property, if any, through a damage award. As one commentator suggested,

> [i]f the client's spouse has ample assets, and the client is not likely to qualify for maintenance, then a tort judgment is desirable, particularly since one can execute it against both the tortfeasor's marital and nonmarital estate.... The tort judgment offers the injured spouse the possibility of a larger recovery [than a divorce proceeding], because it is "limited neither by the size of the marital estate nor by the spouse's income, but only by the quality of the wrong itself and the quantity of damages."

Kawasaki, *supra*, at 419–20 (quoting Barbara H. Young, *Interspousal Torts and Divorce: Problems, Policies, Procedures*, 27 J. Fam. L. 489, 511 (1988–89)).

Regardless of the amount of the marital property, whether the trial court may fashion a monetary award as damages, compensatory or punitive, is open to question. Section 8–205(b)(4) allows consideration of the circumstances leading to the estrangement of the parties, which suggests that the court may consider Ms. Doe's conduct in making a monetary award. Section 8–205(b)(11) also allows the court to consider other factors the court deems necessary or appropriate, providing a catch-all for consideration of other significant facts. Furthermore, in *Dobbyn v. Dobbyn*, 57 Md.App. 662, 680, 471 A.2d 1068 (1984), this Court pointed out that when the Governor's Commission on Domestic Relations Laws discussed the pur-

pose of the monetary award factors, a dispute arose whether to include marital misconduct or fault as a factor. *Id.* The Commission rejected the notion that fault was not a relevant factor in the equitable distribution of marital property and stated:

As virtue, embodied in the respective contributions of the spouses to the well-being of the family which is involved in the first factor, is relevant to the rights and equities of the parties in their marital property, so also is its correlative of fault, embodied in the fourth factor, which refers to the circumstances and facts which contributed to their estrangement. Indeed, it is difficult to see how an adjustment of the rights of the parties could be thought of as equitable, if it failed to consider either of these factors, together with the others named in this Section. It is not suggested that either of these concepts is easy to calibrate, or that its measurement comes readily to hand, but certainly equity requires that the listed factors be weighed by the Court and that the parties' contribution to the familial well-being and their contribution to familial ill-being both be considered. The Commission considers that the nine [now eleven] factors set forth here will go as far as a statute can, in providing for a truly fair and equitable adjustment of the parties' respective rights concerning their marital property. (Report of the Governor's Commission on Domestic Relations Laws, at 11 (1978)).

*Dobbyn,* 57 Md.App. at 680 n. 6, 471 A.2d 1068.

Similarly, in *Court v. Court,* 67 Md.App. 676, 509 A.2d 693 (1986), this Court rejected Mr. Court's argument that fault was totally irrelevant in setting the amount of a monetary award. Pointing to the factor that allows consideration of the circumstances leading to the parties' estrangement, this Court found that the trial court appropriately considered Mr. Court's decision to resign from his job; his decision to sail a ship from Turkey to the United States, a voyage of ten months duration; the requirement he imposed upon his family to move from their Annapolis home to a cottage in Galesville; and his extramarital affairs with a female crew member. *Id.*

In *Skrabak v. Skrabak*, 108 Md.App. 633, 673 A.2d 732, *cert. denied*, 342 Md. 584, 678 A.2d 1048 (1996), however, this Court implied that using a monetary award to penalize a party might be inappropriate. *Id.* at 657, 673 A.2d 732. The appellant, Dr. Skrabak, complained that the trial judge had used "his power to enter a monetary award as a means of *punishing*" him. *Id.* (emphasis in original). In its memorandum opinion, the trial court stated that "it had the right and the obligation under FL § 8–205(b)(11) to consider 'other factors that are necessary or appropriate to consider in order to arrive at a fair and equitable award.'" *Id.* The trial court then described inconsistencies between Dr. Skrabak's deposition testimony and his trial testimony, his actions in apparently attempting to hide income to defraud his wife, and his attempt to obtain fake identification for his 19–year old girlfriend so that she could enter a nightclub with him. *Id.*

Judge Salmon, writing for this Court, noted that "[c]ircumstances not reasonably related to the joint enterprise of the marital unit or expressly included as factors, are not ordinarily relevant and should not be considered when fashioning a fair and equitable monetary adjustment." *Id.* (quoting *Dobbyn*, 57 Md.App. at 681, 471 A.2d 1068). Judge Salmon then suggested that "[i]t would appear, at least on this record, that some of the factors considered by the trial court cannot fairly be characterized as 'reasonably related to the joint enterprise of the marital unit.'" *Skrabak*, 108 Md.App. at 657, 673 A.2d 732. No further elaboration was provided, however, because the Court reversed the monetary award on other grounds. *Id.* at 658, 673 A.2d 732.

We are not certain where the line lies between "considering" the circumstances that lead to the estrangement of the parties and "punishing" the party at fault for the marital breakup. We mention our concern regarding this distinction only in the context of deciding whether the trial court in this case correctly assumed that Mr. Doe would have adequate redress for his injuries through the granting of a monetary award. Because this case is before us as a result of a motion to dismiss all counts of the complaint save the divorce count,

we know neither the amount of the marital property nor how and why the trial court will eventually decide to distribute it. From our vantage point, however, we see the possibility, at least, that Mr. Doe's claimed injuries may not be fully compensated by a monetary award. Thus, we cannot say that his tort claims are precluded because he has another, complete, remedy.

## II.

The trial court found that even if Mr. Doe's claims for intentional infliction of emotional distress (Count III) and fraud (Count II) were not barred by public policy, he nevertheless failed to plead the facts necessary to maintain either action. We now turn to the specific elements of each claim.

### Intentional Infliction of Emotional Distress (Count III)

Maryland recognizes the tort of intentional infliction of emotional distress. *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611 (1977). To establish such a claim, four elements are necessary:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress; [and]

(4) The emotional distress must be severe.

*Miller*, 114 Md.App. at 57, 688 A.2d 976 (quoting *Batson v. Shiflett*, 325 Md. 684, 734, 602 A.2d 1191 (1992)). The elements that must be shown in Maryland are essentially the same as the elements set forth in of the Restatement (Second) of Torts § 46 (1965).

The trial court dismissed Mr. Doe's claim, finding his allegations insufficient to state a claim for intentional infliction of emotional distress because the first two elements were not met:

> The first element of the tort requires that the conduct be intentional or reckless. While Defendant's [Ms. Doe] alleged deception was, most likely, purposeful, it was not

intended to inflict severe emotional distress on the Plaintiff. Nor can the misrepresentation be proven to be reckless in its effect. Given the facts of this case, Plaintiff's feelings and possible reaction are not the only issues to consider. The emotional and financial well-being of A.E. Doe and Z.S. Doe are also at issue and what is in their best interest must be considered. The decision to disclose or not disclose the true identity of their father could have profound effects on A.E. Doe and Z.S. Doe. In addition, given that almost three and one-half years had passed before the Plaintiff discovered the twins were not his biological children, it cannot be argued that Defendant engaged in the deception simply to harm the Plaintiff or with reckless indifference to his feelings. Thus, Plaintiff cannot satisfy the first element of the tort as a matter of law.

While the conduct alleged in this case is reprehensible and should not be condoned, it does not rise to the level of extreme and outrageous required by the second element of the tort. As every trial judge knows, spouses in the throes of domestic turmoil often do horrible things to one another. In the context of everyday life, and probably in the mind of the average juror, these acts would be considered unusually cruel and outrageous. Unfortunately, they are the sad reality of divorce and commonplace in the domestic arena. Misrepresenting the paternity of children born during the course of a marriage is not an uncommon occurrence. One need only look to the case law to realize the frequency of such deception. Moreover, absent DNA testing or some genetic anomaly, it is often difficult to know, with certainty, the true paternity of any child. As such, Defendant's failure to disclose that Plaintiff was not the biological father of A.E. Doe and Z.S. Doe does not qualify as extreme and outrageous within the meaning of the tort. Plaintiff makes much of the fact that the alleged paramour was named as godfather to the children—"a blasphemous and fraudulent act upon the church and God." What occurs between the Defendant, the church and God is not within the jurisdiction of this Court. Outrageous conduct, for purposes of this claim,

is not that which is offensive to religion, but that which is offensive to the law.

(footnote omitted) (citation omitted). The court concluded that Ms. Doe's failure to disclose to Mr. Doe that he is not the biological father of children born during the marriage cannot serve as the predicate for an action for intentional infliction of emotional distress because, "[w]hile the conduct complained of in this case is outrageous[,] it must be viewed in the context of a domestic dispute where the interests of the children must be paramount."

### Intentional and Reckless

The trial court concluded that Mr. Doe's allegations did not satisfy the first element of the tort, stating that although Ms. Doe's conduct was "most likely, purposeful, it was not intended to inflict severe emotional distress on the Plaintiff." The court further stated: "Nor can the misrepresentation be proven to be reckless in its effect." We disagree.

Comment i to Section 46 of the Restatement of Torts, pertaining to intention and recklessness, states that when the actor "desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct," he or she is liable. The actor will also be liable if he or she "acts recklessly ... in deliberate disregard of a high degree of probability that the emotional distress will follow." The drafters of the Restatement provided two illustrations of this principle:

■ During A's absence from her home, B attempts to commit suicide in A's kitchen by cutting his throat. B knows that A is substantially certain to return and find his body, and to suffer emotional distress. A finds B lying in her kitchen in a pool of gore, and suffers severe emotional distress. B is subject to liability to A.

■ The same facts as in Illustration [1], except that B does not know that A is substantially certain to find him, but

does know that there is a high degree of probability that she will do so. B is subject to liability to A.

Restatement (Second) of Torts § 46, cmt. i, illus. 15 & 16.

▮▮ Assuming the facts of Mr. Doe's complaint to be true, we conclude that Mr. Doe's complaint contains material facts that satisfy this element of the tort. In *Ruth v. Fletcher*, 237 Va. 366, 377 S.E.2d 412 (1989), Mr. Fletcher brought suit against Ms. Ruth for intentional infliction of emotional distress when she cut off visitation and disproved Mr. Fletcher's paternity of her five year old child. *Id.* at 367, 377 S.E.2d 412. When considering whether this element of the tort was satisfied, the Virginia Supreme Court stated:

> We fail to discern from this record any proof that [Ms. Ruth's] conduct was "intentional or reckless." There is no proof that she set out to convince [Mr. Fletcher] that the child was his, and to cause him to develop a loving relationship with the child so that in the end, she could hurt [Mr. Fletcher] by taking the child away from him forever. Such proof was required to satisfy the "intentional or reckless" prong....

*Id.* at 373, 377 S.E.2d 412. In contrast to the facts in *Ruth*, here Mr. Doe alleged that "[t]hroughout the course of their marriage, [Ms. Doe] through day to day statements and conduct deliberately, intentionally and with full knowledge of the truth, deceived and lied to [Mr. Doe] misleading him to believe that he was the natural father of all three children born during the course of the parties' marriage." Mr. Doe also stated in his complaint that he "loves each of the children as his or her natural father, [has] developed a close and loving relationship with each of them...." Furthermore, Ms. Doe's letter to her paramour, which Mr. Doe discovered, discusses the children's true paternity and indicates that, even had Mr. Doe not stumbled upon this letter, the truth most likely would have been revealed, thereby in effect "taking the children away from him forever."

These facts are sufficient to allege that, even if Ms. Doe was not substantially certain that Mr. Doe would find out about

her adulterous affair and the paternity of the twins, she did know that there was a high degree of probability that Mr. Doe would discover the truth.

## Extreme and Outrageous

The trial court considered Ms. Doe's conduct "reprehensible," but did not believe it rose to the level of extreme and outrageous as required by the second element of the tort. Yet the court admitted that, to the average juror, Ms. Doe's actions would be considered "unusually cruel and outrageous." The Restatement notes that

> [i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.... Where reasonable men may differ, it is for the jury ... to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

Restatement (Second) Torts § 46 cmt. h.

Our view is that Ms. Doe's conduct may reasonably be regarded as extreme and outrageous as defined by the Restatement. The trial court thought misrepresentation of paternity "not an uncommon occurrence" and implicitly concluded that because such occurrences are "the sad reality of divorce and commonplace in the domestic arena," they are therefore not outrageous. Again we disagree. Regardless of the frequency of this type of misrepresentation, we find that Mr. Doe's allegations pass the threshold test. A fact-finder therefore should be given the opportunity to decide whether Ms. Doe's actions in concealing her affair, concealing the children's paternity, and affirmatively misrepresenting Mr. Doe as the father of the twins in this particular case was sufficiently outrageous to result in liability.

As the Court of Appeals acknowledged in *Harris*, whether a person's conduct is "extreme and outrageous" so as to satisfy the second element of the tort is "a particularly troublesome

question." *Harris,* 281 Md. at 567, 380 A.2d 611. Comment d of Section 46 states that

[t]he cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d.

When determining whether conduct is extreme and outrageous, "it should not be considered in a sterile setting, detached from the surroundings in which it occurred." *Harris,* 281 Md. at 568, 380 A.2d 611. The personality of the person to whom the conduct is directed is a factor, as is the relationship between the plaintiff and the defendant. *Id.* at 568–69, 380 A.2d 611; *see also* Restatement (Second) Torts § 46 cmt. e (noting that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests"). When "the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized by the courts." *Harris,* 281 Md. at 569, 380 A.2d 611.

Nevertheless, the Court of Appeals has acknowledged that, when considering the tort of intentional infliction of emotional distress, " 'recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable

of healing themselves,'" *Batson v. Shiflett,* 325 Md. 684, 734, 602 A.2d 1191 (1992) (citation omitted), thus echoing the Restatement comment that "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46 cmt. d.

 We note the Court must exercise special caution when deciding actions for intentional infliction of emotional distress arising from conduct occurring in a marital context. As one court explained,

> Considerations that justify limiting liability for intentional infliction of emotional distress to only outrageous conduct also suggest a very limited scope for the tort in the marital context.

> Conduct intentionally or recklessly causing emotional distress to one's spouse is prevalent in our society. This is unfortunate but perhaps not surprising, given the length and intensity of the marital relationship. Yet even when the conduct of feuding spouses is not particularly unusual, high emotions can readily cause an offended spouse to view the other's misconduct as "extreme and outrageous." Thus, if the tort of outrage is construed loosely or broadly, claims of outrage may be tacked on in typical marital disputes, taxing judicial resources.

*Hakkila v. Hakkila,* 112 N.M. 172, 812 P.2d 1320, 1324–25 (App.1991). A review of Maryland cases addressing intentional infliction of emotional distress, both within and outside of the marital context, shows that we need not fear a flood of litigation resulting from claims that the position we take here is a loose or broad interpretation of what is extreme and outrageous.

This Court, in *Penhollow v. Board of Commissioners,* 116 Md.App. 265, 695 A.2d 1268 (1997), recently summarized the circumstances in which a claim for intentional infliction of emotional distress has been recognized:

> In ... *Figueiredo–Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991), the Court upheld a claim for intentional infliction

of emotional distress by a plaintiff whose psychologist was having sexual relations with the plaintiff's wife. With regard to the severity of the conduct, the court focused on the relationship between the plaintiff and defendant and stated:

> [A] jury may find extreme and outrageous conduct where a psychologist who is retained to improve a marital relationship implements a course of extreme conduct which is injurious to the patient and designed to facilitate a romantic, sexual relationship between the therapist and the patient's spouse.

*Id.* at 654, 584 A.2d 69.

The Court of Appeals also upheld a claim for intentional infliction of emotional distress in *B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175 (1988). In that case, the defendant failed to disclose to the plaintiff with whom he was having sexual relations that he had active genital herpes. The plaintiff alleged that she had contracted the incurable disease from the defendant after engaging in sexual intercourse with him. In regard to the element of extreme and outrageous conduct, the Court noted that "the characteristics of the illness ... support the extreme and outrageous nature of [the defendant's] conduct." *Id.* at 144–45, 538 A.2d 1175. Some of the characteristics associated with genital herpes included extreme pain, development of cervical cancer, and problems with childbearing.

In *Young v. Hartford Accident & Indem. Co.,* 303 Md. 182, 492 A.2d 1270 (1985), the plaintiff was assaulted at work and suffered physical and emotional trauma as a result of the assault. She received disability payments for a period of time from the defendant, her employer's workers' compensation carrier, and remained under the care of Dr. Peck. The defendant refused to pay a portion of Dr. Peck's bill and insisted that the plaintiff undergo another psychological evaluation despite warning from Dr. Peck of the plaintiff's fragile condition. Following a second evaluation by a psychiatrist chosen by the defendant, the defendant refused to pay the plaintiff's medical bills. A few days later, she attempted suicide. The plaintiff ultimately brought suit

against the defendant for intentional infliction of emotional distress. The Court held that "[i]f [the plaintiff] proves that 'the sole purpose of Doctor Henderson's examination was to harass the Plaintiff into abandoning her claim, or into committing suicide,' a jury could find that that proof meets all of the elements of the tort as set forth in *Harris.*" *Young,* 303 Md. at 198–99, 492 A.2d 1270.

*Penhollow,* 116 Md.App. at 297–99, 695 A.2d 1268.

In *Penhollow,* however, as in *Miller,* this Court found the defendant's conduct not sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. *Penhollow,* 116 Md.App. at 299–300, 695 A.2d 1268. In *Penhollow,* a correctional officer complained that she had been subjected to different terms and conditions of employment on the basis of her sex and had been forced to work in an intimidating, hostile, and offensive work environment. *Penhollow,* 116 Md.App. at 270–71, 695 A.2d 1268. Ms. Penhollow alleged that she had not been treated according to her rank, that a co-worker had repeatedly made insulting comments to her on the basis of her sex, and that her shift hours were frequently changed, requiring her to work overtime hours that other employees were not required to work. *Id.* at 272–73, 695 A.2d 1268. This Court found that

> [t]he case *sub judice* does not involve a special relationship between appellant and appellees as there was in *Figueiredo–Torres v. Nickel.* Appellees' conduct did not result in any physical manifestation that would be sufficient to show the outrageousness of the conduct as in *B.N. v. K.K.* Furthermore, there were no allegations that appellees were aware of or that appellant was in a fragile emotional state as in *Young v. Hartford Accident & Indem. Co.* Additionally, appellant has not alleged or given any proof of physical conduct of a sexual nature directed toward her. The conduct appellant complains of was strictly verbal, some of which was not even directed at her. We agree with the trial court that appellant failed to show that appellees' conduct was of such an extreme and outrageous nature as to satisfy

the elements of the tort of intentional infliction of emotional distress.

*Id.* at 299–300, 695 A.2d 1268.

This Court also recently denied a claim for intentional infliction of emotional distress in *Miller v. Ratner*, 114 Md. App. at 59, 688 A.2d 976. In *Miller*, the plaintiff, who had lived with the defendant in a nonmarital relationship for three years at his home, became seriously ill with breast cancer. *Id.* at 21, 688 A.2d 976. She alleged that during the time she was undergoing radiation treatments, Mr. Ratner would repeatedly wake her up in the middle of the night and admonish her to leave, telling her that she was a financial burden and would soon die. *Id.* at 22, 688 A.2d 976. Mr. Ratner's brother would also telephone her, calling her "bitch," "whore," and a "one-breasted woman." *Id.* Ms. Miller alleged that Mr. Ratner threatened her with bodily harm if she did not leave his house. *Id.* This Court held that "we do not perceive their verbal actions alone to be, as nauseating as they are if true, of such egregiousness so as to satisfy the elements of the tort." *Id.* at 59, 688 A.2d 976.

Additionally, in *Vance v. Vance*, 286 Md. 490, 408 A.2d 728 (1979), the Court of Appeals held that Mr. Vance's misrepresentation that he was divorced at the time of his marriage to Ms. Vance, which Ms. Vance did not discover until twenty years later, did not satisfy the elements of intentional infliction of emotional distress. The Court stated:

Dr. Vance's negligent misrepresentation as to his marital status in 1956, followed by his subsequent concealment of that fact for almost twenty years, could not, of itself, have caused Muriel to suffer emotional distress because she had no knowledge of it. As Dr. Vance suggests, there must have been a subsequent revelation under circumstances such as a deterioration of the marriage which would prevent the situation from being remedied. Consequently, there was no evidence from which the jury could have concluded that in 1956, when Dr. Vance told Muriel that he was free to marry her, that he could or should have anticipated that

under the circumstances existing some twenty years later, he would reveal what he previously concealed and cause Muriel to suffer severe emotional distress. Thus, Dr. Vance could have had no knowledge of what his concealment would likely occasion, and therefore the record fails to disclose any evidence in support of the first or second elements of the tort.

*Id.* at 506, 408 A.2d 728.

No Maryland case has addressed the precise factual issues at bar to determine if Ms. Doe's conduct rises to the level of "extreme and outrageous" necessary to satisfy the second element of this tort. Other states, however, have considered similar issues. Several states have concluded that allegations of adultery alone do not constitute extreme and outrageous conduct. *See, e.g., Whittington v. Whittington,* 766 S.W.2d 73, 74 (Ky.Ct.App.1989); *Poston v. Poston,* 112 N.C.App. 849, 436 S.E.2d 854 (1993); *Ruprecht v. Ruprecht,* 252 N.J.Super. 230, 599 A.2d 604, 608 (Ch.Div.1991).

In *Whittington,* Mr. Whittington allegedly defrauded his wife by forging her signature on the equity check received from the sale of the marital residence and began cohabiting with his paramour shortly before he filed for divorce. *Whittington,* 766 S.W.2d at 73. Consequently, Ms. Whittington filed a complaint alleging intentional infliction of emotional distress, which the trial court dismissed for failure to state a cause of action. *Id.* at 74. The Kentucky Court of Appeals quoted with approval the trial court's memorandum order and opinion, which stated that the court had examined all the allegations in Ms. Whittington's complaint and concluded that none "reaches the tort of outrage. Perhaps the most offensive conduct complained of is fraud and adultery, two of the most routine causes of divorce litigation. As far as this Court is concerned, ordinary fraud and adultery can never reach the status of outrageous conduct." *Id.* The Court concluded that "[t]he emotional and financial distress caused by a spouse's fraud and adultery may be very painful and difficult but does not necessarily implicate the tort of outrage. Suitable relief is

available under Kentucky's domestic relations laws." *Id.* at 74–75.

Similarly, in *Ruprecht*, where the wife had engaged in an adulterous affair with a co-worker for eleven years, the court found that her actions failed to reach the level of outrageousness necessary to meet this element of the tort. *Ruprecht,* 599 A.2d at 608. Citing an Iowa case that also addressed the issue of whether an adulterous affair could be considered sufficiently extreme and outrageous, the Court stated:

> In *Strauss v. Cilek,* 418 N.W.2d 378, 379 (Iowa Ct.App. 1987), the court considered the claim of a husband against his friend for intentional infliction of emotional distress arising from his wife's romantic and sexual relationship with the friend. After noting that plaintiff's wife had obviously been unhappy in her marriage and that she had previously engaged in an extramarital affair that lasted for five years with another of the plaintiff's good friends, the court concluded:
>
> > We do not condone promiscuous sexual conduct. However, we do not find defendant's conduct in participating in a sexual relationship with a married woman, his friend's wife, who willingly continued the affair over an extended period, is atrocious and utterly intolerable conduct so extreme in degree at to go beyond all possible bounds of decency. . . . A recitation of the facts of this case to an average member of the community would not lead him to exclaim, "Outrageous!"

*Ruprecht,* 599 A.2d at 607.

The North Carolina Court of Appeals simply cited *Ruprecht* in summarily deciding that a husband's allegation that his wife "repeatedly exposed her mind and spirit and body to the sexual advances of a male resident of Rowan County, North Carolina" did not "evidence the extreme and outrageous conduct which is essential" to the tort of intentional infliction of emotional distress. *Poston,* 436 S.E.2d at 856.

These cases demonstrate that, according to the Restatement formulation of the tort of intentional infliction of

emotional distress, adultery alone is not enough to satisfy the element of extreme and outrageous conduct. But as two prescient commentators wondered, "[i]f adultery alone were not considered emotional spousal abuse, should it become actionable when combined with deceit? To go perhaps further, what if a wife leads her husband to believe that he fathered her child and a year later reveals that the father was really her lover ... ?" Ellman Sugarman, *supra*, at 1275. We answer this question in the affirmative.

In *Steve H. v. Wendy S.*, 67 Cal.Rptr.2d 90 (Cal.Ct.App.), *review granted*, 68 Cal.Rptr.2d 859, 946 P.2d 817 (Cal.1997), Steve's wife Wendy had had an affair before and during their marriage. Wendy discovered, a day after their child's birth, that her paramour, and not Steve, was the biological father. *Id.* at 91. Wendy did not reveal this fact to Steve, however, until the parties divorced three years later, and Steve petitioned for sole custody of the child. *Id.* Wendy then told Steve that the child had been conceived when Wendy was raped, and induced Steve to take a blood test, knowing it would prove the absence of paternity. *Id.* Steve's complaint alleged that "[i]n lying to Steve about being raped, inducing him to take a blood test, and concealing from him that he was not [the child's] biological father, Wendy acted deliberately and intentionally so as to cause Steve severe emotional distress." *Id.* The trial court dismissed his claim for public policy reasons, and on appeal, Wendy conceded that Steve adequately pleaded a cause of action for intentional infliction of emotional distress. *Id.* at 92. The Court of Appeals, relying on *Richard P. v. Superior Court*, 202 Cal.App.3d 1089, 249 Cal. Rptr. 246 (1988), affirmed the dismissal solely on public policy grounds, and did not consider whether Steve's complaint was sufficient to state a cause of action for intentional infliction of emotional distress. *Steve H.*, 67 Cal.Rptr.2d at 97.

An Illinois appellate court, however, rejected the analysis the California court adopted in *Steve H.*, explaining that "public policy does not serve to protect people engaging in behavior such as that with which plaintiff's complaint charges defendant." *Koelle v. Zwiren*, 284 Ill.App.3d 778, 220 Ill.Dec.

51, 58, 672 N.E.2d 868, 875 (1996). Jan Zwiren moved in with Erik Koelle's father when Erik was 12 or 13 years old and developed a parent-child relationship with him. *Id.* at 53, 672 N.E.2d at 870. Years later, Zwiren and Koelle's father separated, but Zwiren and Koelle maintained a close relationship. *Id.* When Koelle was 21 years old, Zwiren asked him out on her boat, plied him with tequila, and initiated sex with him. *Id.* Approximately nine months later, Zwiren gave birth to a baby girl. *Id.* Although Zwiren knew that the girl's father was Arthur Bass, a wealthy married man and a client of Zwiren's advertising agency, Zwiren told Koelle that the baby was his. *Id.* She asked him to keep the baby's paternity a secret, and told Koelle that she would not seek any financial support from him. *Id.* at 54, 672 N.E.2d at 871.

Throughout the next eight years, Koelle and the child became very close. *Id.* Koelle felt extreme anxiety over not being allowed to tell anyone of his relationship to the child. *Id.* He eventually began seeing a therapist and told some of his friends of the situation. *Id.* His friends encouraged him to take a paternity test, which he did with considerable reluctance. *Id.* The test showed that he was not the child's father. *Id.* Koelle filed a complaint alleging fraud, intentional infliction of emotional distress, and equitable relief. *Id.* The trial court dismissed his complaint on the grounds that his claims were barred by the statute of limitations because Koelle should have suspected earlier that he was not the child's father. *Id.* at 55, 672 N.E.2d at 872. The trial court also found that Koelle failed to state a claim upon which relief could be granted because " 'love and affection' are 'noncompensable.' " *Id.*

The appellate court found that Koelle's claims were not barred by the statute of limitations because reasonable minds could find that Koelle had no reason to suspect Zwiren of perpetrating such a scheme. *Id.* at 58, 672 N.E.2d at 875. In addition, while not addressing specifically whether the conduct alleged was "extreme and outrageous," the appellate court nevertheless found that Koelle had sufficiently stated a claim for intentional infliction of emotional distress. *Id.* As to the

trial court's conclusion that love and affection are noncompensable, the appellate court found that Koelle did not seek to be paid for the love and affection he gave the child, but instead sought compensation for the losses he suffered due to Zwiren's fraud and for the pain and anxiety he experienced due to her intentional infliction of emotional distress. *Id.*

Most recently, the Supreme Court of Oklahoma considered whether concealment and deception regarding paternity constituted acts sufficiently outrageous to state a claim for intentional infliction of emotional distress. *See Miller v. Miller*, 956 P.2d 887, 891–92 (Okla. 1998). Jimmy Miller sued his former wife, Judy, and her parents, alleging that in 1980, for the purpose of inducing him to marry Judy, they knowingly misrepresented to him that Judy was pregnant with his child. *Id.* Jimmy and Judy divorced in 1985, and the court ordered Jimmy to pay child support, which he faithfully did. *Id.* at 892–93. In 1995, when the daughter was 15 years old, she moved into Jimmy's house. *Id.* A year later she told him that when she had originally expressed a desire to live with Jimmy, her mother and grandparents had told her that Jimmy was not her real father and urged her to get to know her real father and his family. *Id.* Jimmy immediately took a paternity test, which verified that he was not the biological father. *Id.*

Two months later Jimmy filed suit, alleging that he was fraudulently induced to marry Judy in 1980. *Id.* Jimmy also alleged that Judy's marriage-inducing misrepresentations, the cruel paternity hoax perpetrated against him, the callous revelation of the hoax through the daughter, and the efforts to undermine his relationship with the daughter amounted to extreme and outrageous conduct. *Id.* at 893. He sought damages against all the defendants for intentional infliction of emotional distress. *Id.* The trial court dismissed his suit, finding it barred by the statute of limitations and issue preclusion. *Id.* at 900–02. The intermediate appellate court affirmed on the basis that Judy's conduct failed to cross the threshold degree of outrageousness necessary to proceed with the tort. *Id.* The Supreme Court disagreed.

Oklahoma, like Maryland, has adopted the Restatement formulation for intentional infliction of emotional distress. *Id.* The Court echoed comment d of § 46 of the Restatement in explaining that only extreme and outrageous conduct, that which goes beyond all possible bounds of decency, will be compensated. *Id.* In finding that Judy's conduct could reasonably be regarded as extreme and outrageous, the Court described the allegations, which included:

(1) the telling of a premarital falsehood going to the heart of the marital and parental relationship, a falsehood which was implicitly repeated every day until the defendants decided the falsehood was no longer useful to them, (2) causing the plaintiff to develop a parental relationship with a child, believing that child to be his biological offspring, and then causing plaintiff to learn that the child was not biologically his own, (3) using the plaintiff to fulfill the emotional, physical, and financial obligations of a husband for almost five years and of a father for fifteen years, knowing that these obligations were not really his, (4) undermining the plaintiff's relationship to his child, first by gratuitously revealing to the child that plaintiff, the man she knew as her father, was not in fact biologically related to her, and then by attempting to establish and foster a parental relationship between the child and another man whom the defendants identified as [the child]'s "real father", and his family, (5) failing to reveal the truth to the plaintiff in the divorce action, resulting in plaintiff joining in a legal document acknowledging his parental relationship to [the child], (6) failing to reveal the truth to the court in the divorce action, thereby showing contempt for the judicial system and making the divorce court an unwitting accomplice to fraud, (7) causing the plaintiff to suffer from the knowledge that he had been hoodwinked and used, and (8) boasting that nothing could be done about their fraud.

*Id.* at 902. The Court concluded that this conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the Section 46 standard. *Id.*

We find the conduct alleged in the instant case similar to that alleged in *Steve H., Koelle,* and *Miller* and more outrageous than that alleged in *Whittington, Ruprecht,* and *Poston.* Mr. Doe has alleged not only that his wife had an adulterous affair, but also that as a result she bore two children, the true paternity of whom she deliberately concealed for three years. As Mr. Doe stated, "[Ms. Doe] purposefully and willfully concealed from [Mr. Doe] the existence of said affair and deliberately misled [Mr. Doe] to believe that she was conducting herself as a chaste and faithful wife." In addition, Mr. Doe alleged that throughout their marriage, Ms. Doe "through day to day statements and conduct deliberately, intentionally and with full knowledge of the truth, deceived and lied to Plaintiff misleading him to believe that he was the natural father of all three children born during the course of the parties' marriage." Mr. Doe alleged specifically that, "[a]mong other things, [Ms. Doe] caused [Mr. Doe's] name to be entered as father on the birth certificates of each of the three children" and that "[Ms. Doe] held [Mr. Doe] out to family, friends, business colleagues, the church and the general public as the natural father of the three children." Mr. Doe also alleged that, "[f]rom birth, [he] related to and loves each of the children as his or her natural father, developed a close and loving relationship with each of them, cared for them, raised them and invested substantial ... resources, both tangible and intangible, in each child's health, welfare and well-being." According to Mr. Doe's complaint, Ms. Doe insisted that M.G. be named godfather of all the parties' children even though Mr. Doe barely knew M.G., a fact that Mr. Doe believed caused him "to unknowingly become a participant in a reprehensible and blasphemous fraud upon the church and God." Ms. Doe continued the deception when Mr. Doe confronted her with the letter to M.G., telling her husband that although she had once been in love with M.G., she had never had sex with him. Mr. Doe alleged that this "heinous and outrageous conduct in deliberately deceiving [him] for several years regarding the true paternity of A.E. and Z.S. has caused [him] enormous damage, including, but

not limited to, debilitating emotional distress, anguish and inexorable public humiliation."

Here, as in *Miller*, Mr. Doe alleged that Ms. Doe told a falsehood going to the heart of the marital and parental relationship; that the falsehood that was repeated every day until Mr. Doe discovered Ms. Doe's letter to her paramour; that Ms. Doe caused Mr. Doe to develop a parental relationship with the twins, then caused him to learn that the children were not biologically his own; that Ms. Doe used Mr. Doe to fulfill the emotional, physical, and financial obligations of a father for three years, knowing those obligations were not really his; that Ms. Doe failed to reveal the truth, even when confronted; and that Ms. Doe caused Mr. Doe to suffer from the knowledge that he had been hoodwinked and used.

We do not speculate as to whether Mr. Doe can prove these allegations or whether a fact-finder will find Ms. Doe's conduct extreme and outrageous. We need only consider whether Mr. Doe's allegations of Ms. Doe's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the Section 46 standard. We believe they may reasonably be so regarded. Thus, we conclude that the trial court improperly dismissed Mr. Doe's claim on this basis.

### Causal Connection and Severity of Emotional Distress

Although the trial court did not address whether Mr. Doe sufficiently alleged the causal connection between the wrongful conduct and the emotional distress and the severity of the emotional distress, we conclude that he did. Mr. Doe alleged that Ms. Doe's conduct in deliberately and intentionally deceiving Mr. Doe regarding the paternity of A.E. and Z.S. "was outrageous, reckless, extreme, beyond the bounds of decency in society, and done in deliberate disregard of the high degree of probability that emotional distress would result to [Mr. Doe] and his family." Mr. Doe then alleged that "[a]s a direct result of [Ms. Doe's] heinous conduct, [Mr. Doe] has suffered and will continue to suffer, severe and extreme emotional distress." Again we will not comment on whether Mr. Doe

can prove these allegations at trial, we consider his allegations sufficient to state a cause of action.

## Fraud (Count II)

The elements of fraud are: (1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation. *B.N. v. K.K.*, 312 Md. 135, 149, 538 A.2d 1175 (1988).

The trial court found Mr. Doe's allegations insufficient to state a cause of action for fraud:

The typical fraud case is predicated upon an affirmative misrepresentation. In the instant case, however, it is an omission that predicates the fraud—the Defendant's failure to inform her husband that he was not the biological father of the twins. The Maryland Court of Appeals has expressly stated that an action for fraud can stand on an omission when the relationship between the two parties imposes a duty to disclose. Under most circumstances, marriage is a relationship that would impose such a duty. In this instance, however, it is not in the best interest of the children to impose upon the Defendant a duty to disclose [to] the Plaintiff that he is not the biological father of the twins.

The children have had the benefit of the love and support of the Plaintiff since their birth. He admits that he cherishes his relationship with A.E. Doe and Z.S. Doe and, in fact, has evidenced his continued desire to support them by seeking custody. Had it not been for the Defendant's alleged misrepresentation by omission, perhaps the twins might not have had the love and support of Plaintiff. Public policy precludes imposing a duty on a mother to disclose

that which may be harmful to her children. The Court is not unsympathetic to the Plaintiff and recognizes that, if the facts are as alleged, he has been wronged. It is unwise, however, to remedy that wrong at the expense of the children. Therefore, the first element of fraud cannot be satisfied as a matter of law.

Additionally, the fourth element of fraud requires that the party deceived would not have acted in the manner he did if he had known of the misrepresentation. Proof of this element requires Plaintiff to show that he would not have given his financial or emotional support to A.E. Doe and Z.S. Doe if he knew that he was not their biological father. As a matter of public policy it would be harmful to the children to allow the Plaintiff to offer the evidence necessary to support this element, especially when an adequate remedy exists within the divorce action. Even if Plaintiff could present evidence to this effect, his fraud claim is barred by his inability to prove the first element.

(footnote omitted) (citation omitted).

We disagree with the trial court's conclusion that public policy bars an action for fraud in this instance. For the reasons we explained *supra*, the "best interests of the children" is not a valid public policy bar to an interspousal tort suit in this instance.

 The trial court reasoned that Ms. Doe made no affirmative misrepresentation regarding the children's paternity, but simply omitted to tell Mr. Doe the truth. We note that concealment can be the basis of a fraud action if there is a duty to speak, such as in a marital or other confidential relationship. *B.N.*, 312 Md. at 151, 538 A.2d 1175. Thus, according to the trial court's analysis, absent a public policy bar, Ms. Doe had a duty to disclose to Mr. Doe that he was not the biological father of the twins. Mr. Doe argues, however, that Ms. Doe affirmatively misrepresented that he was the father of the twins. Ms. Doe admitted that Mr. Doe was named as father on the children's birth certificates and that he has been held out as the natural father of the children.

Regardless of which theory is ascribed, Mr. Doe has alleged sufficiently the first element of fraud, namely that Ms. Doe falsely represented to him that he was the father of the twins; or, in the alternative, that Ms. Doe failed to disclose the true paternity of the children even though she had a duty to speak.

As to the second and third elements, that Ms. Doe knew of the falsity of the representation and that the false representation was made for the purpose of defrauding Mr. Doe, the trial court did not indicate whether it found these elements sufficiently alleged. We note that the allegations regarding the content of Ms. Doe's letter clearly indicate that, at some point, she learned of the true paternity of the children yet continued to represent to Mr. Doe that he was the twins' father. Mr. Doe also alleged that Ms. Doe made the statements "without legal justification or excuse, with malice, ill will and/or with the intent to deliberately injure" Mr. Doe. Thus, we deem that Mr. Doe sufficiently alleged the second and third elements of fraud.

As to the fourth element, the trial court found that it would not be in the best interests of the children if Mr. Doe were to adduce evidence that he would not have acted toward them in the manner he did had he known of Ms. Doe's deception. The trial court also stated that Mr. Doe had an adequate remedy within the divorce action. As discussed *supra*, the best interests of the children are not relevant to a proper analysis of the legal sufficiency of Mr. Doe's claim. Also as discussed *supra*, Mr. Doe may not have an adequate remedy for his tort claims within the divorce action. Mr. Doe alleged that Ms. Doe made the "misrepresentations with the intent that [Mr. Doe] rely on them and [Mr. Doe], in fact, justifiably so relied." Absent a public policy bar, Mr. Doe's allegations were sufficient.

As to the fifth element, damages from the misrepresentation, Ms. Doe argues in her appellate brief that because Mr. Doe wants to continue his relationship with the children, he has failed to allege that he incurred any damages. As a matter of public policy, Ms. Doe asserts, Mr. Doe should not be permitted to claim damages for developing a loving rela-

tionship with the twins. Ms. Doe misapprehends the nature of Mr. Doe's claim. As the Illinois Appellate Court stated in *Koelle*, where Koelle sued for fraud, intentional infliction of emotional distress, and sought visitation rights with the child although he was not the father:

Plaintiff does not seek to be paid for the love and affection he gave [the child]. In fact, his complaint expresses his desire to continue that relationship.

The complaint alleges that plaintiff suffered severely as a result of defendant's allegedly fraudulent scheme. Plaintiff alleges that he experienced constant intense anxiety, developed difficulty dealing with women and cultivating relationships, and abandoned his career goals. These are the injures for which plaintiff seeks to recover. The trial court erred in suggesting that plaintiff seeks to be compensated for loving [the child]. He seeks compensation for the losses he has suffered due to defendant's alleged fraud and for the pain and anxiety he has felt due to her intentional infliction of emotional distress.

*Koelle*, 220 Ill.Dec. at 58, 672 N.E.2d at 875. Here, too, Mr. Doe is seeking damages for the losses he claims to have suffered because of Ms. Doe's alleged fraud, not damages for developing a loving relationship with the children.[5] Thus, Mr. Doe sufficiently alleged the fifth element of fraud.

## III.

Counts IV through VII of Mr. Doe's complaint alleged fraud, negligent misrepresentation, promissory estoppel, breach of contract, and constructive trust. According to Mr. Doe, Ms. Doe promised Mr. Doe that if he regularly deposited his entire income into the family's joint checking account instead of contributing to his 401(k) plan, he could rely on her stockholdings for his retirement. Mr. Doe alleged in 1990

---

**5.** In *Miller*, the Oklahoma Supreme Court did not comment on the damages alleged by Jimmy, which included an amount equal to the sum of court-ordered child support Jimmy had paid for the past ten years, as well as punitive damages. *Miller*, 956 P.2d at 892–93.

that he first discussed with Ms. Doe his desire to make substantial contributions to the 401(k) plan established by his employer, but that Ms. Doe dissuaded him from so doing. Instead, Ms. Doe wanted Mr. Doe to deposit his entire net income in the joint checking account so it could be spent on the family and their new home. In exchange, Ms. Doe promised Mr. Doe that her "substantial common stockholdings" would provide for both of their retirements. From 1992 to 1996, the parties had periodic discussions regarding Mr. Doe's 401(k) plan. Mr. Doe continued to deposit his entire income in the family's bank account and has not made any contributions to his 401(k) plan in the more than seven years he has worked for his employer. Since November 1996, however, Ms. Doe has taken the position that Mr. Doe will not be able to rely on her stockholdings for his retirement.

The circuit court summarily dismissed all of Mr. Doe's claims relating to Ms. Doe's stockholdings, stating:

Marriage contemplates numerous promises for the future. To love, honor and cherish in sickness and health until parted by death are just a few that come to mind. Promises made with regard to the future (including those of a financial nature) may not be binding in the event the parties no longer have a future together. Plaintiff does not suggest that Defendant promised him a share in her stock holdings in the event they were no longer married. Thus, he had no basis to rely on this promise if he and Defendant did not remain together. This alone renders the alleged promise unenforceable. Moreover, it was a mutual decision between the parties that Plaintiff would not contribute to his 401K retirement plan. The money was placed into a joint checking account—available for use by and for the benefit of both parties. The Defendant did not obtain use of those funds without Plaintiff's complicity.

To make Defendant's alleged promise binding, the Court would have to determine what Defendant meant by her promise to provide for the parties' retirement with the proceeds from her stock holdings. How much would she provide and when would she have to provide it are just a

few of the issues the Court would have to determine in assessing damages or awarding Plaintiff a percentage of Defendant's stock holdings. Because of the ambiguity of the alleged promise it would be impossible for the Court to address these issues with any certainty. For these reasons, the Plaintiff has failed to state a claim upon which relief can be granted relating to Defendant's alleged representations regarding her stock holdings.

We agree with the trial court's dismissal of Counts IV through VIII of Mr. Doe's complaint.

### Count IV — Fraud (401(k))

Mr. Doe's complaint did not state with specificity the representations Ms. Doe allegedly made. He merely asserted that she falsely promised Mr. Doe that he could rely on her stockholdings for retirement. He did not describe the stockholdings, nor did he state how much money he would have invested had he not relied on Ms. Doe's alleged promise. Because Mr. Doe did not allege in any detail the specifics of the statement, we are unable to determine if he reasonably relied on the statement. Mr. Doe did not allege how much the 401(k) would have been worth had he not foresworn contributing to it, thus he did not sufficiently allege damages. "Characterizations of acts or conduct, no matter how often or how strongly adjectively asserted are, without supporting statements of fact, conclusions of law or expressions of opinion." *Greenbelt Homes, Inc. v. Board of Educ.*, 248 Md. 350, 360, 237 A.2d 18 (1968). Because Mr. Doe did not provide any supporting facts, we conclude that he failed to state a cause of action for fraud with regard to his 401(k) plan. Furthermore, "[a]llegations of fraud or characterizations of acts, conduct or transactions as fraudulent . . . without alleging facts which make them such, are conclusions of law insufficient to state a cause of action." *Id.*

### Count V — Negligent Misrepresentation

To prevail on a claim of negligent misrepresentation, Mr. Doe must prove that: (1) the defendant, owing a

duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence. *Brock Bridge Ltd. Partnership v. Development Facilitators, Inc.,* 114 Md.App. 144, 160, 689 A.2d 622 (1997). As with the Count IV fraud allegations, we find Mr. Doe's allegations too vague to constitute a sufficient cause of action for negligent misrepresentation. Mr. Doe did not state with specificity the allegedly false statement, nor did he allege facts supporting reasonable reliance or damages caused by the statement.

Moreover, as we stated in *Ward Development Co., Inc. v. Ingrao,* 63 Md.App. 645, 656, 493 A.2d 421 (1985), "[a]n action for fraudulent misrepresentation will not lie for the unfulfillment of promises or the failure of future events to materialize as predicted." Here, the marriage apparently will not continue as Mr. and Ms. Doe may have anticipated at the time of the wedding ceremony, and Mr. Doe did not allege that Ms. Doe promised that he could rely on her stockholdings in the event they were no longer married when Mr. Doe retires.

### Count VI — Promissory Estoppel

The Restatement (Second) of Contracts § 90(1) (1979) defines the elements of promissory estoppel: (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. *Pavel Enters., Inc. v. A.S. Johnson Co.,* 342 Md. 143, 166, 674 A.2d 521 (1996). The trial court correctly determined that Mr. Doe's allegations did not sufficiently establish a clear and definite promise so as to plead a

cause of action for promissory estoppel. Mr. Doe's complaint did not allege what Ms. Doe meant when she allegedly told Mr. Doe he could "rely" on her stockholdings for his retirement, did not identify the stockholdings to which the promise referred, did not indicate whether Mr. Doe would receive an ownership interest in the stockholdings or merely the income, did not establish when Mr. Doe's retirement would begin, and did not estimate the value of the stockholdings. In addition to the lack of a clear and definite promise, Mr. Doe did not allege the fourth element, that his alleged detriment can only be avoided by enforcement of the promise.

### Count VII — Breach of Contract

 A contract is "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." *Kiley v. First Nat. Bank,* 102 Md.App. 317, 333, 649 A.2d 1145 (1994) (quoting Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2–3 (4th ed.1990)). Mutual assent is an indispensable component of every contract. *Id.* An enforceable contract must express with definiteness and certainty the nature and extent of a party's obligations. *Id.* If a contract omits a term or is too vague regarding essential terms, the contract may be invalid. *Id.* As we stated in *Kiley,*

> Of course, no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the

courts, which may be required to enforce it, may be able to know the purpose and intention of the parties.

*Id.* at 334, 649 A.2d 1145 (quoting *Robinson v. Gardiner,* 196 Md. 213, 217, 76 A.2d 354(1950)).

 Here, the contract alleged by Mr. Doe is vague and uncertain in its essential terms. The alleged contract did not address what would happen if the parties divorced, did not specify the value and identity of Ms. Doe's stockholdings, and did not specify how much or when Ms. Doe would have to provide retirement funds for Mr. Doe. The trial court correctly found that because of the ambiguity of the asserted agreement it would be impossible for the court to address any of these issues with any certainty.

### Count VIII — Constructive Trust

 A constructive trust is the remedy employed by the court in equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of that property. *Wimmer v. Wimmer,* 287 Md. 663, 668, 414 A.2d 1254 (1980). This remedy is applied by operation of law when property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding title to retain it. *Id.* Before the court will impose a constructive trust, there must be clear and convincing evidence not only of wrongdoing in the acquisition, but also of the circumstances that render it inequitable for the holder of the legal title to retain the beneficial interest. *Id.*

The Court of Appeals has imposed constructive trusts in cases in which the alleged wrongdoer has acquired property in violation of an agreement or in which another person had some good equitable claim of entitlement to property resulting from the expenditure of funds or other detrimental reliance resulting in unjust enrichment. *Id.* at 669, 414 A.2d 1254.

 Mr. Doe's complaint fails to allege specific facts which, if true, show that he is entitled to this equitable remedy. As we noted *supra,* Mr. Doe did not allege in

sufficient detail the agreement regarding his 401(k) plan. Furthermore, Mr. Doe alleged that both parties agreed that he would deposit his salary in the family's joint account. Thus, Ms. Doe did not fraudulently convert his money. Nor did Mr. Doe allege sufficiently that Ms. Doe had retained her stockholdings in violation of an agreement, because the complaint failed to establish the specifics of that alleged agreement. Mr. Doe claimed he had a rightful interest in Ms. Doe's stockholdings, yet he failed to allege specifically the value or identity of that interest. Thus, we find the trial court correctly dismissed this count for failure to state a claim.

### Epilogue

As a final note, we point out that the trial court mentioned several times its concern regarding repetitive and excessive litigation. The trial court seemed concerned that the case would be litigated twice, once before a judge and once before a jury, thus causing the court to be "flooded with litigation." As to the question of the timing of an interspousal tort suit, namely whether it must proceed concurrent with the divorce or should follow the divorce, we need not mandate any particular path. The trial court is in the best position to assess the logistical issues. We do recognize, however, that there are options.

One approach is to combine the tort trial with the divorce trial. As one commentator noted,

Tort claims, which usually involve a single lump sum award are ... classically legal. A tort plaintiff is generally entitled to a jury trial. The problem thus arises about how to arrange a jury trial for [a party's] tort claim, while keeping the fact-finding for and administration of the divorce in the judge's hands.... There are thus two realistic possibilities for managing the problems of a jury trial in [a spouse's] combined tort and divorce action against [the other spouse]: (1) try the tort claim before a jury first, then incorporate its factual findings and damage award in the judge's divorce decree; (2) have both the tort and divorce claims decided by a judge.

Schepard, *supra,* at 150; *see, e.g., Tevis v. Tevis,* 79 N.J. 422, 400 A.2d 1189, 1196 (1979) (holding that wife's tort claims should have been presented in conjunction with the divorce action "to lay at rest all their legal differences in one proceeding and avoid the prolongation and fractionalization of litigation"); *Twyman v. Twyman,* 855 S.W.2d 619, 625 (Tex.1993) (holding that when joinder of tort claims with divorce is feasible, resolving both claims in the same proceeding avoids two trials based at least in part on the same facts).

Another approach, to proceed with the divorce trial first, and then turn to the tort claims, apparently has been successful in Maryland. In *Gordon v. Gerhold,* 90 Md.App. 360, 600 A.2d 1194 (1992), Ms. Gerhold filed a complaint for divorce when her husband was arrested and charged with conspiring to murder her. *Id.* at 362, 600 A.2d 1194. Subsequently, she proceeded against him in a tort action, suing for damages for intentional and negligent infliction of emotional distress, fraud, and other torts. *Id.* at 363, 600 A.2d 1194. The appeal before this Court pertained to issues other than the divorce and subsequent tort suit, but the fact that the two suits proceeded without comment suggests that the tort trial may, in some circumstances, follow a suit for divorce. *See, e.g., Koepke v. Koepke,* 52 Ohio App.3d 47, 556 N.E.2d 1198, 1200 (1989) (holding that husband should have been allowed to pursue tort action against wife for intentional infliction of emotional distress independent of divorce action); *Stuart v. Stuart,* 143 Wis.2d 347, 421 N.W.2d 505, 508 (1988) (noting that "although joinder is permissible, the administration of justice is better served by keeping tort and divorce actions separate"). One virtue of this seriatim approach is trying the divorce first will refine the extent to which the claimed tort damages cannot be addressed under the Family Law Article of the Code.

JUDGMENT AS TO COUNTS II AND III REVERSED; JUDGMENT AS TO COUNTS IV THROUGH VIII AFFIRMED; COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND APPELLEE.